John GRAY, Plaintiff,

v.

The ZONDERVAN CORPORATION, Nominal Defendant,

James G. Buick, Gordon H. Buter, Max D. Du Pree, William J. Gaither, Jay Van Daalen, Gordon J. Van Wylen, Keith C. Vander Hyde, Smith Barney, Harris Upham & Co., Inc., and TZC Acquisition, Inc., Defendants.

No. G87–818 CA1 (Related Nos. G86–928 CA and G86–762 CA).

United States District Court, W.D. Michigan, S.D.

Aug. 12, 1988.

Edited Version Released for Publishing May 19, 1989.

Pinsky Smith Fayette Soet & Hulswit, H. Rhett Pinsky, Grand Rapids, Mich., for plaintiff; Robert A. Holstein, Jewel N. Klein, Holstein, Mack & Dupree, Frederic F. Brace, Jr., Law Offices of Frederic F. Brace, Jr., Chicago, Ill., of counsel.

J.A. Cragwall, Jr., Warner Norcross & Judd, Grand Rapids, Mich., for Zondervan Corp., James G. Buick, Gordon H. Buter, Max O. DePree, Jay Van Daalen, Gordon J. Van Wylen and Keith C. Vander Hyde.

Robert A. Buchanan, Law Weathers & Richardson, Grand Rapids, Mich., for TZC Acquisition, Inc.

Neal M. Goldman, Squadron Ellenoff Plesent & Lehrer, New York City, for defendants.

## OPINION

HILLMAN, Chief Judge.

*Introduction*

This case involves the sale of Zondervan Corporation, a publisher of evangelical Christian materials, to Harper & Row Publishers, Inc. The plaintiff, John Gray, has been a shareholder of Zondervan since 1983. At the time of the filing of this action, Mr. Gray owned more than 60,000 shares of Zondervan stock. Zondervan is a Michigan corporation publicly traded on the over-the-counter market.

Defendant James G. Buick is Zondervan's Chief Executive Officer. He is also a company director and member of the Executive Committee of the Board of Directors. Defendant Gordon Buter is the Chairman of the Board of Directors of Zondervan and a member of its Executive Committee. Defendants Joanne M. Boer, Max D. DuPree, Jay Van Daalen, Gordon J. Van Wylen, Keith C. Vander Hyde, and Glenn E. White are or were directors of Zondervan during the relevant periods. Defendants Van Daalen, Vander Hyde, and Van Wylen are also members of Zondervan's Executive Committee. Defendants DuPree, Van Daalen, Vander Hyde, and Van Wylen are members of Zondervan's Finance Committee. The codefendant TZC Acquisition, Inc., a Michigan corporation, is a wholly owned subsidiary of Harper & Row Publishers, Inc. Its sole purpose is to facilitate the proposed merger of Harper & Row and Zondervan.

The plaintiff has filed a preliminary injunction motion seeking to enjoin a tender offer for all outstanding shares of Zondervan made by TZC Acquisition, Inc. The complaint asserts claims under the federal securities laws, as well as pendent claims under Michigan common law. Only the state-law claims are involved in this motion. The gravamen of the state-law allegations is that the defendants breached their common-law fiduciary duties in negotiating and agreeing to the sale of Zondervan to TZC. More specifically, the plaintiffs contend that the defendants breached their fiduciary duties in four different ways:

1. by requiring potential bidders to sign a two-year "stand-still agreement" which prohibits such bidders from acquiring Zondervan's stock and soliciting proxies without Zondervan's consent;

2. by acting to preserve the economic self-interest of management at the shareholders' expense;

3. by refusing to meet with at least one suitor, the Wolgemuth & Hyatt group; and

4. by accepting a merger agreement with Harper & Row which protected the jobs of top management, and effectively prevented any higher bids for Zondervan through inclusion in the merger agreement of a stock "lock-up" option, a "topping fee" provision, and a "termination fee" provision.[1]

---

1. A stock lock-up option allows a prospective purchaser to purchase a certain number of shares of the target company at a set price if a purchase agreement is terminated for any rea-

In light of these alleged wrongdoings, the plaintiff seeks an order invalidating the stand-still provisions previously entered into between Zondervan and potential purchasers; invalidating the various lock-up, topping fee, and expense reimbursement fee provisions of the agreement with TZC; and finally, enjoining the completion of the TZC tender offer and merger agreement.

*Statement of Facts*

This motion has proceeded on an expedited discovery and hearing schedule because the tender offer at issue expires on Monday, August 15, 1988. Thus, the following statement of facts by necessity is preliminary in nature. Despite the present severe time constraints, the court has reviewed the affidavits of record, the key cases cited by counsel, the testimony of William Steinmetz, an investment banker involved in the transaction, and the most important portions of the voluminous record.

The saga of Zondervan begins in October, 1986, when the Zondervan Board of Directors decided for reasons not pertinent here to put the company up for sale. The Board retained a nationally recognized investment banking and brokerage firm, Smith Barney, Harris Upham & Co., Inc., to facilitate the sale. Zondervan's long-standing Grand Rapids counsel, Warner, Norcross & Judd, was also intimately involved in the transaction. These two firms were hired to advise the Board on the respective financial and legal aspects of the sale. In addition, the Board formed a Special Negotiation/Evaluation Committee charged with evaluating purchase proposals and making recommendations to the full Board.

The Special Committee consisted exclusively of outside directors. The Committee Chairman, Keith Vander Hyde, is the Chairman and Chief Executive Officer of Guardsman Products, Inc., and a director of several other well-known corporations in the Grand Rapids area. Also on the Committee were Glenn White, a Vice President of Personnel and Organization at the Chrysler Corporation, where he has been employed for some 35 years, and Jay Van Daalen, the President of Keltran, Inc., a transportation and trucking company.

The Special Committee did not seek financial or legal counsel independent of that provided to Zondervan management. However, Smith Barney Managing Director William Steinmetz, who was intimately involved with Zondervan during the entire sale period, testified that he regarded Smith Barney to be the representative of the Committee, not management. He also testified that Zondervan management was represented at Special Committee meetings because management was the sole source of necessary information about the company.

Smith Barney began looking for a purchaser in the fall of 1986, shortly after the Special Committee was formed and Smith Barney had been retained. Evidence in the record discloses that Smith Barney contacted 86 prospective bidders. Twenty-five of these requested and received confidential information concerning Zondervan. Of the twenty-five, eight engaged in substantial due diligence investigations with the cooperation of management.

Before Zondervan would release confidential corporate information, the interested parties were required to sign confidentiality agreements. The confidentiality agreement included a so-called "stand-still" provision which, among other things, prevented the potential purchaser from mounting a hostile takeover attempt for two years following the signing of the agreement.

As an aside, early on one early suitor, a well-known concern in the field, MacMillan, was excused from the stand-still requirement when apparently it balked at signing it. MacMillan did, however, execute the remainder of the confidentiality agreement.

son. A "topping fee" is a fee paid to a prospective purchaser if the target company is bought by someone else for a higher price. A "termination fee" is a fee paid to a prospective purchaser if a purchase agreement is terminated for any reason other than breach by the buyer. It is designed to reimburse the prospective purchaser for expenditures incurred in pursuing the transaction.

Despite these and other inquiries, Zondervan received no serious purchase offers during 1986 and 1987. The price of Zondervan stock during this period dropped significantly, perhaps in response to the lack of bidder interest.

By April 1988, however, two encouraging proposals had emerged. One interested party was the Oxford Investment Group, Inc. The other serious contender was Wolgemuth & Hyatt, a relatively small religious publishing firm located in Nashville, Tennessee. The Special Committee met with its advisers to consider the Oxford and Wolgemuth proposals on May 5, May 9, and May 13, 1988. Smith Barney recommended to the Committee that it reject the Oxford offer. Smith Barney also expressed reservations about the Wolgemuth & Hyatt proposal because it was inadequate in price and had uncertain financing. In particular, Smith Barney advised the Committee that Wolgemuth was a small concern and that its principals would require outside equity to buy Zondervan.

The Wolgemuth proposal also included deductions in the offering price because of the existence of severance agreements that had been given to certain key employees. Steinmetz testified that when the Special Committee learned of the deduction in the offering price because of the severance agreements, it decided to recommend cancellation of those agreements in order to increase the offering price. The cancellation of the severance agreements resulted in an increase in the value of Wolgemuth's offer to shareholders from approximately $10.75 per share to $12.00 per share.

Despite the problems with the Wolgemuth offer, discussion between the parties continued. Wolgemuth and Zondervan representatives met to negotiate in Grand Rapids on May 20. On June 2 or 3 Wolgemuth forwarded a draft merger agreement to Smith Barney. The Special Committee met to discuss the draft merger on June 13. Representatives of Zondervan management, legal counsel, and Mr. Steinmetz were present at this meeting.

Smith Barney analyzed Wolgemuth's $12 per share offer, and reported to the Committee that it was in the lower end of a range of price fairness. Smith Barney also expressed concern about a proposed $1 million topping fee, an uncapped expense fee that Steinmetz testified could have run to $2 million or more, and the continued uncertainty of Wolgemuth's financing. Smith Barney also told the Committee of preliminary discussions with another potential suitor, Harper & Row, and advised the Committee that Harper & Row might be interested in bettering Wolgemuth's $12 offer.

The Committee agreed that it should seek a price greater than $12 per share. The Committee also adopted certain guidelines setting forth the considerations under which it was willing to recommend a purchase offer to the full Board. In general terms, the Committee set a target price of $14 per share. It was willing to consider giving a purchaser certain so-called "comfort provisions"—break-up or topping fees —if that price could be achieved. The Committee also decided that it would not recommend Board approval of an agreement containing a "no-shop" provision which would require Zondervan to refrain from soliciting or responding to other acquisition proposals, unless the price and terms of a purchase offer including a no-shop clause should be so attractive as to be preemptive. The Committee finally concluded that it wanted credible evidence from potential purchasers that financing was in place.

In late June, Harper & Row representatives came to Grand Rapids and met with their Zondervan counterparts. After discussions with Smith Barney, Harper & Row forwarded a proposal to Zondervan on July 5 that included the following provisions:

1.   $13.50 per share in cash;

2.   a stock option to purchase one million authorized but unissued shares at $13.50 per share;

3.   a $5 million termination fee; and

4.   an agreement with existing management to abandon their severance package and sign new employment agreements.

Unlike the other bidders, Harper & Row had set financing in place.

The Special Committee met to consider Harper & Row's offer on July 6. Smith Barney advised the Committee that the Harper & Row proposal was higher in price and had a higher degree of certainty than earlier proposals from other bidders. Smith Barney also told the Committee that the Harper & Row proposal was the best the Committee could reasonably expect. The Committee reacted with caution, deciding that it wanted a price of $14, or in the alternative, significant improvements in the proposed termination fees and stock option provisions. The Committee authorized Smith Barney to go back to Harper & Row and negotiate the best possible terms. Steinmetz testified that it was his impression that Harper & Row was seriously interested in completing the transaction with all possible speed.

The following day, Smith Barney met with top Harper & Row management in New York City. Representatives of Harper & Row's investment bankers, Allen & Company, and Harper & Row's attorneys attended the meeting. Negotiations continued in earnest between July 7 and July 12.

During negotiations, Zondervan sought to have the proposed break-up fees and option provisions removed from the proposal. Harper & Row responded that they would do so, but only in return for lowering the offering price from $13.50 to $12.50 per share. Faced with losing the $13.50 per share cash offer, Zondervan negotiators agreed to the principle of including the option and the fees, and concentrated instead on their size and scope. The proposed $5 million termination fee was reduced to a $1 million expense reimbursement fee, and a $2.2 million topping fee. The expense reimbursement fee was to be paid if the transaction were abandoned for any reason other than a breach by Harper & Row. The topping fee was to be paid only if some company other than Harper & Row purchased Zondervan at a higher price. Finally, Harper & Row agreed to limit the circumstances under which the stock option could be exercised.

During the July 7 to July 12 period, Smith Barney was also talking to other interested parties, including Wolgemuth and a new suitor, the Thomas Nelson Publishing Company. Steinmetz testified that he told Drexel Burnham Lambert, Inc., Wolgemuth's financial advisers, and Paine Webber, who was advising the Nelson group, that Smith Barney had been engaged in discussions with another corporate player. Steinmetz asked representatives of Wolgemuth and Nelson whether they would be willing to improve their offers. Dennis McCarthy, a Drexel Burnham employee working with Wolgemuth, told Steinmetz that Wolgemuth would not improve its existing $12 per share offer more than twenty-five cents. Steinmetz told McCarthy that the Wolgemuth proposal would receive consideration at the July 12 Special Committee meeting.

The Special Committee met during the evening of July 12 to decide whether to recommend Harper & Row's offer to the full Board. Smith Barney advised the Committee to recommend approval of Harper & Row's offer because (1) financing was set; (2) the $13.50 cash offer was near the top of the range of fair value; (3) the offer was at least a dollar more than the next highest offer; and (4) the lock-up option, topping, and termination fees were reasonable given the size of the transaction. Smith Barney also advised the Committee that it had contacted Wolgemuth & Hyatt and Thomas Nelson, as the Committee had requested, and that they were unwilling or unable to approach the terms of the Harper & Row offer.

After extensive deliberations, including an exhaustive review of the proposed merger agreement, a detailed report on the Harper & Row offer prepared by Smith Barney, complete financial analysis, and the advice of counsel, the Committee voted to recommend the offer to the full Board.

The action taken by the Committee appears to be of considerable significance. Notes taken by Zondervan's general counsel, Brent Clark, at that meeting show that the Committee, before it recommended approval of the Harper & Row offer, solicited

professional advice and explored all reasonable options. Specifically, the notes show that Smith Barney had been in contact with Wolgemuth and other potential bidders before the meeting, and that these other interested parties did not appear inclined to improve the terms of their proposals.

The notes also show that some management employees were disappointed by the loss of their severance packages as part of the Harper & Row agreement, but that the Committee felt it necessary to surrender the packages in order to secure the best possible price. This is strong evidence that the Board's primary interest, when it approved the Committee's recommendation, was in the welfare of the shareholders, rather than the effect of the agreement on management.

The full Board met the following morning, July 13. Following a presentation by Smith Barney, the Board unanimously accepted the Special Committee's recommendation. The Zondervan/Harper & Row agreement was then publicly announced.

Shortly after the announcement, Wolgemuth contacted Zondervan and asked to be released from its stand-still agreement. Zondervan, through its attorney, advised Wolgemuth that it would consider the release if Wolgemuth came forward with some evidence that it was seriously planning to top Harper & Row's offer. According to Mr. Steinmetz, Wolgemuth never responded. No other bidder ever came forward.

*Legal Analysis*

In order to prevail on his motion, plaintiff has the burden of establishing four factors: (1) a substantial likelihood of success on the merits of the action; (2) a likelihood of irreparable harm if the court does not issue the injunction; (3) a negative impact on the public interest if the motion is denied; and (4) the possibility of substantial harm to others. *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir. 1988). These factors are not a "rigid and comprehensive test," but rather "are factors to be balanced, not prerequisites that must be met." *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985). Preliminary injunctive relief is within the sound discretion of the trial court, but is to be granted sparingly and only in the most compelling cases.

*A. Likelihood of Success*

The court measures the decision of Zondervan's Board of Directors to enter into the agreement with Harper & Row in reference to the so-called "business judgment rule." This rule recognizes that under normal circumstances courts are reluctant to substitute their judgment for that of a corporation's directors. The rule was summarized recently in *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 574–75 (11th Cir.1988):

> Under the business judgment rule directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in fraud, bad faith or an abuse of discretion. *Mobil Corp. v. Marathon Oil Co.,* Fed.Sec.L. Rep. (CCH) ¶ 98,375 at 92,284, 1981 WL 1713 (S.D. Ohio) [available on WESTLAW, 1981 WL 1713], *rev'd on other grounds,* 669 F.2d 366 (6th Cir.1981) (quoting *Treadway Cos., Inc. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir.1980); *see Smith v. Van Gorkom,* 488 A.2d 858, 872–73 (Del.1985). "If the business judgment rule applies, there is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del. 1986) (quoting *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). In the corporate takeover context, the business judgment rule applies once the directors have satisfied their duty "to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders." *Van Gorkom,* 488 A.2d at 873; *see Revlon,* 506 A.2d at 180.

Michigan follows the business judgment rule as it has been formulated and applied

by the majority of courts. *See, e.g., Good v. Modern Globe, Inc.*, 346 Mich. 602, 609–10, 78 N.W.2d 199, 203 (1956); *Wagner Electric Corp. v. Hydraulic Brake Co.*, 269 Mich. 560, 257 N.W. 884 (1934). The ultimate question in this case is therefore whether the plaintiff can prove that the Zondervan defendants conducted the bidding process in a manner amounting to bad faith or fraud, or otherwise abused their discretion. In effect, the plaintiff must show that the directors breached their fiduciary duties to the shareholders. *See Edelman v. Fruehauf Corp.*, 798 F.2d 882, 886 (6th Cir.1986).

Plaintiff initially contends that the defendants abused their discretion by agreeing to Harper & Row's stock lock-up option, topping and expense fees, and employment contracts for current Zondervan management. In *Cottle*, the court observed that there are both legal and illegal lock-ups. A lock-up is generally considered lawful where it is likely to encourage more or higher bids, and thus result in greater value to shareholders. A lock-up may be unlawful, on the other hand, if it is so advantageous to one bidder that for all practical purposes it substantially discourages any further bidding. While the question of whether the lock-up effectively ends bidding is relevant, it is not necessarily determinative. As stated in *Cottle*, "all auctions must end some time." *See* 849 F.2d at 575–76.

In *Cottle*, the court approved a merger agreement between Storer Communications, Inc. and Kohlberg, Kravis, Roberts & Co. that contained an asset lock-up and a termination fee like those at issue here. In doing so, the court considered the following factors to be relevant:

1. the length and diligence of the search for bidders, and the number of bidders who showed interest;

2. the haste in which the winning offer was accepted and whether or not the Board meaningfully negotiated the terms of competing offers;

3. the value given to shareholders by the winning bidder in exchange for the lock-up; and

4. the reasonableness of the cost of the lock-up provisions.

849 F.2d at 576–77. The participation of outside directors, and whether the Board is able to accept better offers after agreeing to the lock-up, are also relevant considerations. *See Samjens Partners I v. Burlington Industries, Inc.*, 663 F.Supp. 614, 624–25 (S.D.N.Y.1987).

Applying these factors to this case, the court recognizes that the evidence is in dispute or conflicting. Nevertheless, defendants have presented credible evidence that the lock-up option and other fees included in the agreement were properly accepted by the Board. First, Zondervan's search for a buyer was long and exhaustive, culminating in the critical June–July 1988 period when only two serious bidders, Harper & Row and Wolgemuth, remained in the picture. As the *Cottle* court put it, after 20 months of trying to sell the company, it was time to end the auction.

Second, while the Board may have acted quickly to accept Harper & Row in the period between July 5 and July 13, Zondervan's representatives engaged in serious negotiations with both Wolgemuth and Harper & Row. Credible evidence establishes that despite Zondervan's best efforts, Wolgemuth would not raise its final $12 per share offer more than twenty-five cents. In contrast, these negotiations produced substantial improvements in the option and fee components of Harper & Row's $13.50 per share offer.

Third, the various options and fees served to increase shareholder value. The lock-up option, topping fee and termination fee provisions were granted to Harper & Row, in effect, in exchange for Harper & Row's agreement to raise its offer from $12.50 to $13.50 per share. Moreover, the stock option granted to Harper & Row, if exercised, would also have increased shareholder value. The option price for the shares was set at the same $13.50–per–share price as the tender offer. If exercised, the option would likely have the effect of increasing the book value of all the

outstanding shares, further increasing shareholder value.

Fourth, according to the professional advice given both the Committee and the Board by its financial and legal experts, the price of the lock-up option, termination fee and topping fee were reasonable. There is no evidence tending to show that the lock-up involved here was more expensive than is customary in the merger context. On the contrary, evidence exists in the record to show that the lock-up option and the various fees created a 62–cents–per–share advantage for Harper & Row over other bidders. Although this extra cost might deter other bids, it would not necessarily end the auction. *See Yanow v. Scientific Leasing, Inc.,* 1988 CCH Sec.L.Rep. ¶ 93,660, 98,030, 1988 WL 8772 (Del.Ch. 1988).

Finally, as was the case in *Samjens Partner I,* there is evidence that the initial decision to recommend acceptance of the lock-up was made by outside directors after substantial deliberation and with extensive input from financial and legal experts. The record further suggests that the directors were still open to better offers even after the acceptance of the Harper & Row agreement. All of the factors suggest a well-reasoned, considered decision by the Board and Committee of Zondervan. *See Samjens Partners I,* 663 F.Supp. at 624–25.

In light of the foregoing, plaintiff has not presented evidence sufficient to convince the court that he is likely to prevail on his assertion that defendants' decision to accept the Harper & Row lock-up and the other fees was an abuse of discretion in violation of the business judgment rule.

■ Plaintiff next asserts that defendants breached their fiduciary duties by refusing to meet with Wolgemuth before the Harper & Row offer was accepted. The record clearly establishes, however, that Smith Barney, at the same time it was negotiating with Harper & Row, was also in contact with Wolgemuth representatives in an effort to encourage Wolgemuth to improve its offer. Moreover, notes taken at the July 12 Special Committee meeting show that the Wolgemuth offer and Wolgemuth's refusal to better that offer were discussed before the Committee voted to recommend the Harper & Row proposal to the full Board.

Further, even if defendants did not give Wolgemuth adequate opportunity to top Harper & Row's offer, and even if Wolgemuth was in fact interested in making a better offer, there is no evidence that the price of the accepted Harper & Row bid was in any way inadequate. The price adequacy of a proposed tender offer is a relevant consideration in determining whether a Board has met its fiduciary duties. *See Cottle,* 849 F.2d at 577. Smith Barney stated that the $13.50 per share price was in the upper end of the range of fairness, and defendants agreed. Harper & Row had also demonstrated significant advantages over Wolgemuth in terms of financial strength and general reliability. Under these circumstances, the court concludes that plaintiff is not likely to succeed on his claim that the alleged failure to pursue Wolgemuth was an abuse of discretion sufficient to vitiate the protection of the business judgment rule.

■ Plaintiff's third claim is that by agreeing to accept Harper & Row's proposal, defendants acted to preserve the economic interests of management at the expense of the shareholders. The only evidence for this claim appears to be that the Harper & Row/Zondervan merger agreement contains severance and employment contracts for several members of Zondervan management. This is not, however, sufficient evidence to carry plaintiff's burden of showing that defendants did not exercise permissible business judgment.

Defendants argue that it was Harper & Row, and not Zondervan, that insisted on the employment agreements to ensure continuity following the merger. Defendants also contend that management gave up more lucrative "golden parachutes" already in place when the Board agreed to Harper & Row's employment provisions. The record supports defendants' claims. As stated previously, the notes taken at the July 12 Special Committee meeting show that certain employees were very dis-

appointed in losing their severance packages. The Committee, however, believed that elimination of the packages was necessary to maximize shareholder value.

In addition, Mr. Steinmetz testified that the Special Committee was prepared to suggest abandonment of the "golden parachutes" because it believed they would dilute the value to shareholders of the initial Wolgemuth offer. Finally, the Zondervan/Harper & Row merger agreement contains a so-called "fiduciary-out clause" which specifically allows Zondervan to abandon the transaction in the event a better offer is made. Of course, abandonment of the merger would also mean abandonment of the management employment contracts. All of this is convincing evidence that the Committee in fact considered the interests of the shareholders, and not the interests of top management, to be its principal responsibility. Plaintiff has failed to show a substantial likelihood of success in his attack of the employment agreements.

■ Plaintiff's final claim is that the defendants violated their fiduciary duties by requiring interested suitors to sign the stand-still agreements. The defendants contend that the stand-still agreement furthered the legitimate interest of ensuring an orderly bidding process. Mr. Steinmetz testified that such agreements are standard practice in the investment banking industry. The Sixth Circuit has expressly approved stand-still agreements. *See Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215–16 (6th Cir.1984). The plaintiff has presented no facts or legal arguments that would rebut the presumption that defendants exercised proper business judgment in requiring the stand-still agreement.

In sum, on the present record the court concludes that plaintiff has not established a substantial likelihood of success on the merits of his Michigan common-law claims for breach of fiduciary duty.

### B. Irreparable Injury

Turning to the second prong of the preliminary injunction standard, the court similarly concludes that plaintiff has not met his burden of showing that he is likely to suffer irreparable injury if an injunction does not issue. Plaintiff argues that he cannot rely on a subsequent award of damages to compensate him for defendants' alleged unlawful failure to obtain the best possible price for shareholders, because evidence of any price better than Harper & Row's would be speculative.

The court does not agree that such evidence must necessarily be speculative. Convincing evidence of other bidders prepared to go higher might well establish plaintiff's damages, assuming he is able to establish a breach of a fiduciary relationship. A second alternative would be a judicial appraisal of the value of the shares at the relevant time. Courts regularly refuse to grant preliminary injunctive relief to shareholders bringing derivative claims in the merger context on the ground of failure to establish irreparable injury. *See Enterra Corp. v. SGS Associates*, 600 F.Supp. 678, 691–92 (E.D.Pa.1985).

### C. Public Interest and Harm to Others

In regard to the last two prongs of the preliminary injunction analysis, the court is satisfied that if it were to enjoin this tender offer the potential for harm to Zondervan, its shareholders, and to Harper & Row would be substantial. The parties to this merger have worked long and hard. No evidence exists that any higher bids would be forthcoming. Thus, enjoining the tender offer might well result in a significant financial loss to the shareholders.

Furthermore, the public interest is served by allowing a presumptively legitimate private transaction, such as Harper & Row's tender offer, to proceed, at least where there is no convincing evidence of any manipulation of the market or corporate wrongdoing.

### Conclusion

In light of the foregoing, plaintiff is not entitled to extraordinary preliminary relief. The motion for preliminary injunction is denied.