**ST. JUDE MEDICAL, INC., Appellant,**

v.

**MEDTRONIC, INC., et al., Respondents.**

No. C4–95–183.

Court of Appeals of Minnesota.

Aug. 22, 1995.

Review Denied Oct. 27, 1995.

Richard Ihrig, Terrence J. Fleming, Michael D. Olafson, Lindquist & Vennum, P.L.L.P., Minneapolis, for appellant.

William Z. Pentelovitch, Richard G. Wilson, Alain M. Baudry, Maslon, Edelman, Borman & Brand, P.L.L.P., Minneapolis, for respondents.

Michael J. Wahoske, David Y. Trevor, Dorsey & Whitney, P.L.L.P., Minneapolis, for amicus curiae Securities Industry Ass'n.

Considered and decided by HUSPENI, P.J., and PETERSON and SCHULTZ,* JJ.

## OPINION

HUSPENI, Judge.

In seeking to enforce a "termination fee" provision in a proposal to acquire another company, appellant contends the district court erroneously granted summary judgment for respondents. Because we conclude that the termination fee is a valid and enforceable contract, we reverse summary judgment and direct the district court to enter judgment in favor of appellant. We affirm the trial court's dismissal of the unjust enrichment and tortious interference with contract claims.

## FACTS

This case arises out of the merger and acquisition of respondent Electromedics, Inc., a company which designs, manufactures, and markets medical equipment and disposable devices, focusing on blood therapy and surgical care. Both appellant St. Jude Medical, Inc., and respondent Medtronic, Inc., sought to acquire Electromedics.

Medtronic purchased 346,359 shares of Electromedics' stock between March and August 1993. In July 1993, Medtronic presented an unsolicited merger proposal of $5.50 per share; Electromedics rejected the offer outright, but realized that the company was on the market despite the fact that it had "not plan[ned] to be for sale."

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

Electromedics hired Dain Bosworth as its financial advisor to consider "strategic alternatives" for the company's future. Eighteen potential buyers surfaced. The Electromedics board of directors decided to auction off the company to secure the best price for the shareholders.

St. Jude hired Piper Jaffray Inc. as its financial advisor for the exclusive purpose of proposing the acquisition or merger with Electromedics. As of November 4, 1993, St. Jude was an active contender in the competition for merger. St. Jude expressed a strong interest in purchasing Electromedics under the condition that St. Jude would have an exclusive right to negotiate and would receive a termination fee, which would be $2–4 million, in the event negotiations fell through.

On November 12, Medtronic formally proposed a merger at $6.125 per share. The Electromedics board considered the offer inadequate, but did not give Medtronic an answer.

By December 6, Electromedics entered into a final agreement and merger plan with St. Jude. The exclusive agreement required Electromedics to refrain from marketing the sale of the company or contacting other "suitors." The agreement also included the following "termination fee" provision:

> In recognition of the efforts and expenses expended and incurred by [St. Jude] with respect to Electromedics and the opportunity Electromedics presents to [St. Jude], if (i) this Agreement is terminated * * *, Electromedics will pay to [St. Jude] within five business days after demand by [St. Jude] * * * a termination fee equal to $3,000,000.

No fee would be due if a court prohibited the merger, if the Electromedics board did not approve the merger, or if St. Jude breached the agreement. St. Jude's final bid was $6.375 per share.

The day after news of the merger reached the press, Medtronic sent Electromedics a new formal offer of $6.75 per share. St. Jude agreed to match that bid. Medtronic then increased its bid to $6.875 per share and put $3 million in escrow to cover the possible termination fee to St. Jude.[1] St. Jude made it clear that it expected Electromedics to pay the $3 million termination fee if it accepted Medtronic's bid.

On December 22, the Electromedics board authorized a merger with Medtronic at $6.875 per share, for a total of $97 million. When Electromedics informed St. Jude of its decision, St. Jude demanded payment of the termination fee. The merger agreement with Medtronic prohibited Electromedics from paying the fee without Medtronic's prior written consent. When Electromedics failed to pay the fee, St. Jude brought this action, alleging breach of contract, unjust enrichment, tortious interference with contract, and a claim for attorney fees and costs.

In March 1994, St. Jude moved for summary judgment and Electromedics/Medtronic moved to dismiss St. Jude's claims. In denying both motions, the district court, noting that "many [jurisdictions] have upheld termination fees," chose to use a "liquidated damages analysis to determine the validity of the fee provision in question." After addressing the factors used to determine whether a liquidated damages provision is, in fact, a penalty rather than a reasonable estimate of actual damages, the court stated:

> [I]nsufficient evidence has been presented to the Court to allow it to conclude, as a matter of law, that the termination fee is a penalty rather than a valid liquidated damages provision.

After a December 1994 hearing before a second district court judge, Electromedics/Medtronic's motion for summary judgment was granted. This court concluded:

> Electromedics did not intend to liquidate [St. Jude's] damages when they agreed to

---

1. Dain Bosworth and counsel for Medtronic were of the opinion that the termination fee provision in the St. Jude merger was invalid and unenforceable. Medtronic wanted Electromedics to accept its offer, terminate the St. Jude merger agreement, and refuse to pay the termination fee because it was invalid. Electromedics perceived this as an agreement to breach another agreement and refused nonpayment of the termination fee. As a compromise, Medtronic agreed to deposit $3 million into an escrow account to fund any liability for the termination fee under the St. Jude agreement.

the three million dollar penalty fee. [St. Jude's] candid concession through its counsel at oral arguments is a binding judicial admission evincing the intent of the parties in regards to the liquidated damages. Accordingly, [St. Jude] cannot carry its burden of establishing the first element of its first claim for relief. Therefore, the three million dollar penalty provision is void and will not be enforced.

## ISSUE

Did the district court erroneously apply a liquidated damages analysis to the termination fee issue and determine that the termination fee was an unenforceable penalty?

## ANALYSIS

On appeal from summary judgment, this court must determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992). Construing and giving effect to the plain meaning of contract language is a question of law. *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 916–17 (Minn.1990). This court reviews questions of law de novo.[2] *Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 483 (Minn.1985).

In the corporate world, termination fees are a common and generally accepted method to "reimburse the prospective purchaser for expenditures incurred in pursuing the transaction." *Gray v. Zondervan Corp.*, 712 F.Supp. 1275, 1276–77 n. 1 (W.D.Mich.1988). Cancellation fee provisions typically require the [seller] to pay the bidder a specified dollar amount. * * * [T]he fee ordinarily ranges from one to five percent of the proposed acquisition price. A cancellation fee reduces the risk of entering a negotiated merger by guaranteeing the initial bidder reimbursement for the out of pocket costs associated with making the

offer and, in some instances, for the bidder's lost time and opportunities. Accordingly, they are increasingly common in negotiated acquisitions.

Stephen M. Bainbridge, *Exclusive Merger Agreements and Lock–Ups in Negotiated Corporate Acquisitions*, 75 Minn.L.Rev. 239, 246 (1990).

■ Contrary to Electromedics/Medtronic's assertion that termination fees are inherently invalid and unenforceable,[3] the law generally accepts them as long as they do not encroach upon the ultimate purpose of the acquisition process: to sell a company to the highest bidder and maximize the shareholders' profits. *See CRTF Corp. v. Federated Dep't Stores, Inc.*, 683 F.Supp. 422, 440 (S.D.N.Y.1988) (termination fees are legal if they "enhance rather than stop the bidding"); *Samjens Partners I v. Burlington Indus., Inc.*, 663 F.Supp. 614, 624 (S.D.N.Y.1987) (company board may implement termination fee only if it enhances bidding); *cf. Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 184 (Del.1986) (court rejected $25 million termination fee because fee was part of larger plan to thwart potential buyers' efforts to acquire Revlon).

State and federal courts have upheld termination fees when a well-informed board negotiated the fee in good faith, with no apparent conflict of interest, and followed responsible procedure, *In re J.P. Stevens & Co.*, 542 A.2d 770, 783 (Del.Ch.1988); when the amount of the termination fee is reasonable in relation to the bidder's efforts and the magnitude of the transaction, *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 578 (11th Cir.1988); and when the reasonable and fully-disclosed fee does not hinder a board vote on the overall merger/sales transaction, *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128, 1150–51 (D.Or.1984).

**2.** St. Jude and Electromedics selected Colorado law to govern their agreement.

**3.** We note that despite this argument renouncing termination fees, the Electromedics/Medtronic's merger agreement contained a $2 million termination fee provision identical to the provision at

issue here. The termination fee, originally $3 million, had been reduced to $2 million when Medtronic increased its bid to $6.875 per share and put $3 million in escrow to cover the possible termination fee to St. Jude at issue in this case.

The parties here, with the benefit of legal counsel and financial advisors, negotiated the termination fee as part of the merger agreement. The $3 million fee is reasonable as it is only a small percentage of the total $90 million contract sales price. Most importantly, the termination fee provision brought St. Jude into the auction as a committed bidder for purchase, and was a catalyst for the bidding contest that ultimately resulted in Electromedics receiving a bid close to its market value. For these reasons, we conclude the termination fee provision was valid and enforceable. *See Beebe,* 578 F.Supp. at 1150–51 (termination fee valid when reasonable and no hinderance to merger).

The district court, however, applied a liquidated damages analysis to this case and invalidated the termination fee as an unenforceable penalty because St. Jude admitted that it never intended to liquidate damages. *See Kirkland v. Allen,* 678 P.2d 568, 571 (Colo.Ct.App.1984) (intent is one of three necessary elements a party must establish to have valid claim for liquidated damages).

We are aware that termination fee provisions have been likened to liquidated damage provisions. *Cottle,* 849 F.2d at 578; *Beebe,* 578 F.Supp. at 1150 n. 7. A liquidated damages analysis is inappropriate here,[4] however, because this case lacks the breach of contract necessary to invoke such analysis. By definition, a party may establish a claim for liquidated damages only when it proves three essential elements: (1) the parties intended to liquidate damages; (2) at the time the parties made the contract, the amount of liquidated damages was a reasonable estimate of the presumed actual damages that the breach would cause; and (3) at the time the parties made the contract, it was difficult to determine the amount of actual damages that would result from a breach. *Rohauer v. Little,* 736 P.2d 403, 410 (Colo.1987). Implicit in each of these elements is the breach of a contract. One court has aptly defined liquidated damages as

the sum a party to a contract agrees to pay if he *breaks some promise,* and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue *from the breach,* is legally recoverable as agreed damages *if the breach occurs.*

*Westmount Country Club v. Kameny,* 82 N.J.Super. 200, 197 A.2d 379, 382 (App.Div. 1964) (emphasis added), *quoted in In re Plywood Co.,* 425 F.2d 151, 154 (3rd Cir.1970). Indeed, "damages," by their very nature, mean "compensation in money as a substitute for and the equivalent of the promised performance." 5 Arthur L. Corbin, *Corbin on Contracts* § 990 (1964).

The parties agree that no breach occurred here when Electromedics accepted Medtronic's bid rather than St. Jude's; the merger agreement allowed Electromedics to choose a course of action: either accept St. Jude's offer or select another buyer and pay St. Jude the termination fee. Electromedics exercised a contract right when it chose to accept Medtronic's offer; that decision did not breach the merger agreement with St. Jude. Without an underlying breach of contract, the court cannot apply a liquidated damages analysis to this case. Thus, the first district court erred when it initially applied a liquidated damages analysis to the facts of this case, and the second district court erred in interpreting the candid admission of counsel for St. Jude that there was "no intention of liquidating damages" as requiring a conclusion that the termination provision must be an unenforceable penalty.

Because the merger agreement gave Electromedics a choice of performance, we believe it is appropriate to liken the termination fee provision to an alternative performance contract.

An alternative contract is one in which a party promises to render some one of two or more alternative performances either one of which is mutually agreed upon as the bargained-for-equivalent given in ex-

---

4. The first district court applied a liquidated damages analysis and denied summary judgment, resulting in a nonappealable order. Thus, we review the issue here, on appeal from the second district court's decision to grant summary judgment based upon the liquidated damages analysis.

change for the return performance by the other party.

*Id.* § 1079; *see id.* § 1213 (if "contract provides that the promisor shall have a choice or option between performances, * * * the contract may well be regarded as an alternative contract"); *see also Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 689 (10th Cir.1991) (alternative performance contracts, such as "take or pay" gas purchase contracts, are distinguishable from liquidated damages contracts).[5]

> [S]ome alternative contracts giving the power of choice between the alternatives to the promisor can easily be confused with contracts that provide for the payment of liquidated damages in case of breach, provided that one of the alternatives is the payment of a sum of money. * * * If, upon a proper interpretation of the contract, it is found that the parties have agreed that either one of the two alternative performances is to be given by the promisor and received by the promisee as the agreed exchange and equivalent for the return performance rendered by the promisee, the contract is a true alternative contract. This is true even though one of the alternative performances is the payment of a liquidated sum of money; that fact does not make the contract one for the rendering of a single performance with a provision for liquidated damages in case of breach.

Corbin at § 1082, *quoted in Prenalta*, 944 F.2d at 689.

Electromedics/Medtronic contend that the termination fee provision was not an alternative performance contract because St. Jude was not obligated to perform in exchange for the $3 million termination fee that Electromedics would pay. In making this argument, Electromedics and Medtronic overlook the nuances of the merger agreement and the auction process.

The record shows that the parties drafted the merger agreement to cover two stages— the auction period as well as the purchase and merger. The merger agreement committed St. Jude as a purchaser of Electromedics and, thereby, increased the stakes in the auction. When St. Jude signed the merger agreement, it presented itself as a viable contender for purchase: St. Jude had already hired financial advisors, undergone complex financial analysis and preparation, and taken the risk publicly to commit to the merger.

The history of the auction proves that St. Jude's initial bid, and later its willingness to increase the bid, caused Medtronic to increase its own bid twice and to offer a purchase price near Electromedics' actual market value. This sequence of events is remarkable, considering that Medtronic's initial unsolicited bid had been far below Electromedics' market value. Ultimately, Electromedics sold for $11 million more than it would have before St. Jude became a contender in the acquisition.

The merger agreement between Electromedics and St. Jude enhanced the bidding and maximized the shareholders' profits. The record shows the termination fee in this case worked, as St. Jude contends, "exactly as it should have." During that first stage of the contract, St. Jude performed by actively participating in the auction. Electromedics agreed to perform by paying a termination fee if the parties' negotiations ended after this first stage and never progressed to the merger with St. Jude.

In the second stage of the contract, St. Jude would have performed by purchasing Electromedics for $90 million and Electromedics would have performed by approving the sale. Implicit in the parties' agreement, however, is the fact that they would never have reached this second stage if Electromedics chose to sell to another company. The merger agreement gave Electromedics the choice to end at stage one or proceed to stage two.

When Electromedics selected Medtronic as its buyer, Electromedics terminated its

---

**5.** Courts have approved of alternative performance contracts in the form of "take or pay" natural gas supply contracts which require gas customers to "take" (purchase) a minimum amount of gas, or "pay" the cost of the gas not purchased. *Colorado Interstate Gas Co. v. Chemco, Inc.*, 854 P.2d 1232, 1235 (Colo.1993).

**30**

merger agreement with St. Jude at stage one, after St. Jude had already provided consideration for the contract. Given that Electromedics chose to terminate the contract at that stage, Electromedics still had the duty to perform by paying St. Jude the $3 million termination fee.

The district court erred when it applied a liquidated damages analysis to this case and invalidated the termination fee as an unenforceable penalty. The termination fee provision is a valid and enforceable contract between the parties.

■ In view of our determination that the termination fee provision is enforceable, we do not address appellant's claim of unjust enrichment, nor do we address appellant's claim that Medtronic interfered with the merger agreement[6] by prohibiting Electromedics from paying the termination fee. We conclude that St. Jude cannot establish any damage under those claims. Medtronic compromised with Electromedics and put $3 million in escrow to cover the termination fee in the event that it was enforceable. If this court's determination that the termination fee is enforceable is not modified upon further review, those funds will be released to appellant.

Finally, St. Jude requests an award of costs and attorney fees on appeal, arguing that Medtronic's tortious interference with the merger required St. Jude to bring an action to enforce its contract rights. Given that St. Jude has failed to establish a claim for tortious interference, it is not entitled to an award of costs or attorney fees.

### DECISION

The district court erred when it invalidated the termination fee as an unenforceable penalty. We reverse summary judgment on the termination fee provision and direct the district court to enter judgment of $3 million in favor of St. Jude. We affirm the dismissal of the unjust enrichment and tortious interfer-

ence with contract claims. St. Jude's request for costs and attorney fees is denied.

**Affirmed in part and reversed in part.**

---

**6.** A claimant must establish all five elements of tortious interference with contract in order to raise a successful claim: a valid contract existed between the plaintiff and third party, the defendant knew of the contract, the defendant intended to induce the third party to breach the contract, the defendant's action induced the breach, and caused damage to the plaintiff. *R–G Denver v. First City Holdings of CO, Inc.*, 789 F.2d 1469, 1474 (10th Cir.1986).