Suzanne W. SPARKS, Plaintiff,

v.

REGIONAL MEDICAL CENTER BOARD; Regional Health Services, Inc.; Northeast Alabama Regional Medical Center, Anniston, AL. and Dr. Thomas A. Garland, individually and as a contract physician with Northeast Alabama Regional Medical Center, Defendants.

No. CV–91–PT–1671–E.

United States District Court, N.D. Alabama, E.D.

May 12, 1992.

Ann C. Robertson & Dennis G. Pantazis, Gordon Silberman Wiggins & Childs, Birmingham, Ala., for plaintiff.

Paula A. Hilburn, Chad Schultz & F. Carlton King, Jr., Ford & Harrison, Atlanta, Ga., Terry McElheny, Dominick Fletcher Yeilding Wood & Lloyd, Birmingham, Ala., for Hospital defendants.

Charles L. Parks, Anniston, Ala., for defendant Garland.

## MEMORANDUM OPINION

PROPST, District Judge.

This cause comes to be heard on the Motion for Summary Judgment filed February 19, 1992 by defendants Regional Medical Center Board, Regional Health Services, Inc. and Northeast Alabama Regional Medical Center ("Hospital defendants"). The Hospital defendants move for summary judgment on plaintiff's claims under Title VII of the Civil Rights Act and her pendent tort claims under Alabama law. On January 7, 1992, the court denied defendant Garland's motion for summary judgment.

██ A summary judgment is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c). The court may consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any ..." in deciding whether to grant or deny a summary judgment motion. FED.R.CIV.P. 56(c). The moving party has the initial burden of proving that no material facts are in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." *Cottle v.*

*Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir.1988). The nonmoving party must do more than show there is "some metaphysical doubt as the material facts." *Id.* Rule 56 requires the nonmoving party "to affirmatively allege specific facts to demonstrate a genuine dispute." *Id.*

#### Facts

The court has thoroughly reviewed the depositions, affidavits and exhibits filed in this case and finds undisputed the following material facts. Defendant Northeast Alabama Regional Medical Center ("Hospital") employed plaintiff Susan Sparks from August 1985 until May 30, 1991. Plaintiff contends she was constructively discharged on or about May 30, 1991. The Hospital contends she voluntarily resigned. Nevertheless, the Hospital offered and plaintiff accepted reemployment in November 1991.

The Hospital is owned and operated by the Regional Medical Center Board ("Board"). The Board entered into a Pathology Professional Agreement with Anniston Pathology in July 1985. (Exh. 2 attached to Garland Dep.) Anniston Pathology is a partnership between Dr. Thomas Garland and Dr. William Talbot. The Agreement provided that Dr. Garland and Dr. Talbot, as independent contractor(s), would provide anatomical and clinical pathology services to the Hospital's pathology laboratory and department.[1] (Exh. 2 attached to Garland Dep.) Dr. Garland and Dr. Talbot rotated two-year terms as Clinical Laboratory Director. (Garland Dep. at 48) Garland served as director in 1990 and through September 1991. As director, Garland was in charge of the medical direction of the pathology department and lab. (Overstreet Dep. at 8–9)

Besides Garland and Talbot, the pathology lab consisted of a number of medical secretaries and technicians employed by the Hospital.[2] While the medical direction of the department and lab was under the control of Garland and Talbot, personnel decisions were the direct responsibility of Alex Overstreet, Director of Laboratory Services of the Hospital. Overstreet reported to Linda Barnes, Vice President of Professional Services, and Mike Kelly, Vice President of Human Resources. Barnes and Kelly reported to Adam Fletcher, the Hospital President and CEO. The Agreement between Anniston Pathology and the Hospital provided that Garland and Talbot could offer advice and recommendations as to the employment, termination, and reinstatement of lab and department personnel. (Exh. 2 attached to Garland Dep.) The Hospital and Board, however, had final say as to all personnel employment and disciplinary decisions.[3]

Plaintiff's first position at the Hospital was as a venipuncturist. Plaintiff worked in this capacity for approximately four years and during this time occasionally came into contact with Garland, but had no complaints. (Sparks Dep. at 19, 20–21) In May 1989, plaintiff became a medical secretary in the pathology department. While a medical secretary, plaintiff cross-trained as a histotech and, upon the recommendation of Garland, became a full-time histotech in the lab in October 1989. (Sparks Dep. at 23)

---

1. The parties have raised the issue of whether Garland is an "employee" of the Hospital defendants. This issue, however, does not effect the outcome of the case. As provided in the EEOC guidelines:

 An employer may also be responsible for acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

 29 C.F.R. 1604.11(e).

2. David Dawson and Becky Luther are employees of Anniston Pathology.

3. According to Kelly, the Hospital's disciplinary system was written down in the Employee Policy Manual which was distributed to all employees at the time of their hiring. The disciplinary system contained five steps: (1) verbal warning; (2) written warning; (3) second written warning (in some circumstances); (4) disciplinary probation; and (5) discharge. (Kelly Dep. at 33–39) Disciplinary decisions within the pathology department and lab were mostly made by Overstreet. However, decisions involving suspension and discharge were made by Kelly. (Kelly Dep. at 29–30)

The alleged sexual harassment began occurring after plaintiff became a medical secretary. According to plaintiff, the following events occurred:

(1) Garland shot rubber bands and staples at plaintiff.[4] (Sparks Dep. at 26–31)

(2) While passing in the hall, Garland pushed plaintiff into the wall.[5] (Sparks Dep. at 31–36)

(3) Garland slammed the door into plaintiff on numerous occasions. (Sparks Dep. at 33, 57)

(4) Garland teased plaintiff about everyone she went out with. (Sparks Dep. at 42)

(5) Garland teased plaintiff about her breast size. When breast biopsies came to the lab, Garland would say in front of everyone, "This is about the size of Suzanne's whole breast." (Sparks Dep. at 43, 48)

(6) Garland referred to plaintiff's apartment as a "sex pad." (Sparks Dep. at 46)

(7) Garland would joke about plaintiff going to Saudi Arabia to entertain the troops. (Sparks Dep. at 46)

(8) Garland would refer to plaintiff as "Joyce, Jr."—a former secretary who liked to go out to bars and dance. (Sparks Dep. at 43, 46)

(9) Garland threw a tape dispenser and book at plaintiff, and also, on more than one occasion, twisted her arm behind her back forcing her to her knees. (Sparks Dep. at 126, 132)

(10) Garland used the word "fuck" frequently, although plaintiff concedes that Garland never used the word in a sexual context. (Sparks Dep. at 55, 97)

Plaintiff admits that on occasion, she stuffed papers in her bra and imitated Mae West (Sparks Dep. at 49); established a "boob fund" in a jar on her desk (Sparks Dep. at 65–66); joked about her own breast size [6] (Sparks Dep. at 66); put a foreign substance on Garland's doorknob and moved the furniture out of his office as a "payback" for something he had done (Sparks Dep. at 143–44); told Garland about men she found attractive and asked him to fix her up with somebody. (Sparks Dep. at 147, 155; Garland Dep. at 146–47) Plaintiff further conceded in her deposition that Garland never touched her in a sexual way, had sex with her, or demanded sexual favors. (Sparks Dep. at 94, 135–38) According to plaintiff, Garland also never told her that her job would be affected if she did not do something sexual with him. (Sparks Dep. at 96)

Garland admits calling plaintiff's apartment a "sex pad," referring to plaintiff as "Joyce, Jr.," and "poking" her while walking down the hall. (Garland Dep. at 208–09, 238) Garland also admits shooting rubber bands at plaintiff and dropping staples in her hair, but does not remember throwing books or shooting staples at her, or slamming a door into her. (Garland Dep. at 175, 177, 240) According to Garland, he never asked plaintiff about her sex, social or personal life unless she brought it up first (Garland Dep. at 208–09), and only commented on her breast size after she "repeatedly joked" about her own breast size. (Garland Dep. at 148–49)

On March 1, 1991, plaintiff arrived late to work and Garland confronted her in the hall in the presence of her co-workers. Garland was extremely angry and asked her why she was late. Plaintiff explained that her son had missed the school bus and she therefore had driven him to school. Not believing this excuse, Garland said:

> Suzanne, if you ever fucking lie to me again, I'll make your life so fucking miserable that you will wish you had put in

---

**4.** Plaintiff admits shooting back, but always in "self-defense." Other employees participated in the battles, but plaintiff claims they were always initiated by Garland and Dawson. According to plaintiff, "[It] started out playful, but he [Garland] doesn't know when to quit." (Sparks Dep. at 26–31)

**5.** According to plaintiff, "He was playing but he plays hard." Plaintiff did not report the incident to anyone. (Sparks Dep. at 35–36)

**6.** Plaintiff contends that Garland always initiated the joking. However, histotech Laura Blankenship stated in her deposition that the breast size joking was sometimes initiated by plaintiff. (Blankenship Dep. at 91–95)

for a fucking transfer ... I can't depend on you, Dr. Talbot can't depend on you, and your co-workers can't depend on you.

(Sparks Dep. at 53) Garland admits he said approximately the above. (Garland Dep. at 164) Garland explains, however, that his reaction was in response to plaintiff's frequent tardiness, her poor work, and her inability to realize the importance of her work. (Garland Dep. at 165–66)

Several days after this confrontation, plaintiff met with Overstreet and told him that Garland had hollered at her in front of her co-workers and had cursed her about being late and unreliable. (Overstreet Dep. at 30, 31) Overstreet suggested that plaintiff talk to Barnes and Kelly. (Overstreet Dep. at 29, 31) Kelly met with plaintiff on March 6, 1991 at which time plaintiff related this incident and the other incidents involving Garland. (Kelly Dep. at 60–61) Kelly read to plaintiff the definition of sexual harassment out of a personal book he owned. (Kelly Dep. at 66) Kelly then investigated plaintiff's complaint and interviewed a number of plaintiff's co-workers.[7] (Kelly Dep. at 71–74) Kelly found plaintiff's complaint largely corroborated. (3/23/91 Letter attached to Sparks Dep.) Kelly then met with Fletcher on or about March 8, 1991. (Kelly Dep. at 144)

Kelly and Overstreet both testified that they were unaware of any problems involving Garland prior to Spark's complaint on or about March 6, 1991. (Kelly Dep. at 111; Overstreet Dep. at 62, 76, 81–82) Overstreet stated in his deposition that prior to plaintiff's complaint, he never had a conversation with anyone concerning Garland and his treatment of female employees. (Overstreet Dep. at 22–23) According to Overstreet, he never witnessed the joking or rubber band fights, but he did hear about the "playful" shooting of rubber bands. (Overstreet Dep. at 29, 33) Plaintiff contends, however, that Overstreet was aware what was going on prior to March 6, 1991.

On March 12, 1991, Kelly and Fletcher met with Garland and informed him of their findings.[8] They discussed how the EEOC defines sexual harassment and the Hospital's policy regard sexual harassment.[9] Kelly and Fletcher orally warned Garland that sexual harassment was unacceptable and would not be tolerated by the Hospital. They told Garland that all personnel related issues should be referred to Overstreet. Kelly and Fletcher also warned Garland that any retaliation would not be permitted. (3/23/91 Letter attached to Sparks Dep.; Kelly Dep. at 145–46, 174; Fletcher Dep. at 78; Garland Dep. at 241–42) Following this meeting, Kelly met back with Sparks and her co-workers and told them that he had met with Garland, that they should not fear retaliation, and that all future personnel problems should be addressed to Overstreet.[10] (Kelly Dep. at 178) Kelly also told Overstreet to keep him informed if anything further happened

7. According to Kelly, he assured each co-worker interviewed that physicians could make recommendations and suggestions, but the Hospital had the ultimate right to decide who is employed and who is not. He assured each co-worker that they had nothing to fear in talking with him. (Kelly Dep. at 99)

8. According to Kelly, Garland didn't deny any of the findings during the meeting, but simply defended himself by saying he was a "perfectionist." (Kelly Dep. at 171)

9. The Hospital's employee manual states:

The Regional Medical Center does not and will not permit employees to engage in discriminatory practices or sexual harassment involving patients, visitors or their co-workers. Employees who believe they are being subjected to sexual harassment by a co-worker, supervisor or manager, or who believe their employment is being adversely affected by such conduct, should report such incidents to the Vice President of Human Resources. A prompt and thorough investigation will be conducted. If the employee is not satisfied with the conclusion of the investigation, he or she may submit the matter to the appropriate Vice President or the President/CEO for review.

10. Plaintiff stated in her deposition that despite Kelly's assurances, she still feared losing her job. (Sparks Dep. at 104) According to plaintiff, Garland repeatedly told her that he got her the job and could take it away. (Sparks Dep. at 104, 175) Plaintiff also believed that Overstreet was intimidated by Garland and that Garland could take disciplinary actions against employees. (Sparks Dep. at 176)

in the lab involving Garland. (Overstreet Dep. at 40)

Following these meetings, Kelly made adjustments in plaintiff's work schedule so that she would not have to work directly and personally with Garland. (Sparks Dep. at 170) These changes created resentment and anger among plaintiff's co-workers who had to carry plaintiff's workload whenever her activities involved direct contact with Garland. (Sparks Dep. at 170; Overstreet Dep. at 50–51)

For the next eight weeks, no acts of harassment or retaliation were reported by plaintiff or her co-workers.[11] Fletcher periodically checked with Overstreet and was told that things remained a little tense, but were getting better. (Fletcher Dep. at 97) At some point between March 12 and May 15, plaintiff told Kelly that Garland was documenting everything the employees did wrong and telling them to thank plaintiff for it. (Sparks Dep. at 172–73, 178; Exhibit 14 attached to Garland Dep.) Overstreet reported three events to Kelly which occurred between March 12 and May 15: (1) Garland asked Overstreet for plaintiff's personnel file. Overstreet refused to hand it over;[12] (Overstreet Dep. at 40–41) (2) Garland asked Overstreet to write plaintiff up for not following proper lab procedures. Overstreet refused to write her up because he believed other employees had committed the same infraction;[13] (Overstreet Dep. at 44–45) and (3) Garland threatened to write the histotechnology registry board and tell them to deny plaintiff's certification as a registered histotech, even if she passed the test. (Overstreet Dep. at 42; Sparks Dep. at 179, 182–86)[14]

On May 15, 1991, plaintiff reported to Kelly that Garland had confronted her and asked whether she planned to pursue charges against him. (May 15, 1991 Letter attached to Garland Dep.) Garland admits he said to plaintiff, "If you sue me, I'll sue you." (Garland Dep. at 172) According to plaintiff, she also told Kelly at this time about Garland's threat to write to the histotechnology registry board. (May 23, 1991 Letter attached to Sparks Dep.) Kelly investigated Spark's complaints and found them corroborated. (May 23, 1991 Letter attached to Sparks Dep.; Kelly Dep. at 188) During Kelly's investigation, plaintiff was given time off from her job with pay. (Kelly Dep. at 193)

On May 22, 1991, Kelly and Fletcher met with Garland and informed him in writing that any act of retaliation, including writing an unfounded letter to the registry board, would result in termination of his contract with the Hospital. (May 23, 1991 Letter attached to Sparks Dep.; Garland Dep. at 246; Kelly Dep. at 189; Fletcher Dep. at 102) Garland agreed not to take any retaliatory action, write the registry board, harass, or otherwise engage in inappropriate conduct. (May 23, 1991 Letter attached to Sparks Dep.) The Hospital believed that its express warning to Garland, and his clear understanding of the conse-

---

**11.** On March 12, 1991, Kelly received an EEOC charge of sexual harassment filed by plaintiff. Kelly responded to the charge by April 12, 1991. (Kelly Dep. at 183) On June 6, 1991, the EEOC found the charge moot and dismissed it. The EEOC stated that all issues had been satisfactorily resolved by the Hospital and there had been no further acts of sexual harassment. (Fletcher Affidavit of 2/14/92)

**12.** Garland admits requesting plaintiff's personnel file for the purpose of checking when he wrote a letter commending plaintiff's job performance. (Garland Dep. at 192) A commendation letter was written by Garland and Talbot and sent to Overstreet on June 6, 1990. (Ex. 7 attached to Garland Dep.; Sparks Dep. at 66–67) Kelly testified that a letter of commendation by Garland about plaintiff was not in plaintiff's personnel file. (Kelly Dep. at 59)

**13.** Sparks was written up by Overstreet for tardiness. (Kelly Dep. at 62) Overstreet states that plaintiff was written up not because Garland asked, but because of hospital policy. (Overstreet Dep. at 43–44) According to Overstreet, Garland asked that plaintiff be disciplined for tardiness, but after checking it out, he reached the conclusion that discipline was not necessary. (Overstreet Dep. at 49)

**14.** Apparently, Garland also wrote a letter on March 11, 1991 criticizing plaintiff's work and accusing her of coming to work intoxicated. (Sparks Dep. 182) Kelly and the Hospital did not pay any attention to the memo. (Sparks Dep. at 183)

quences of disobeying it, resolved the situation. The Hospital wrote a letter to plaintiff on May 23, 1991 advising her that Fletcher and Kelly had met with Garland, had taken additional steps to prevent retaliation against her, that Garland had agreed not to take any retaliation action against her, including harassing her and writing a letter to the registry board. The Hospital stated that it believed the situation was resolved and requested plaintiff to return to work on May 28, 1991. (May 23, 1991 Letter attached to Sparks Dep.) Plaintiff did not return to work on May 28 and expressed in a letter from her attorney her concerns about Garland and her interaction with him in the lab. (Sparks Dep. at 193–95) In a letter dated May 28, 1991, the Hospital offered to transfer plaintiff back to her old job as a venipuncturist, at the same pay, and on the same shift. The Hospital requested a decision by May 30, 1991 and demanded that she return to work by May 31. (May 28, 1991 Letter attached to Sparks Dep.) Despite the Hospital's assurances that as a venipuncturist plaintiff would have no direct working relationship with Garland, plaintiff believed that she would still have contact with Garland in this position and requested a transfer to another floor.[15] (Sparks Dep. at 204) Plaintiff quit when the Hospital refused to transfer her to another floor. (Sparks Dep. at 101, 111) In November 1991, after this lawsuit was filed, the Hospital offered and plaintiff accepted a position on another floor.

15. Kelly testified that during his conversations with plaintiff about her return to work, plaintiff did not mention the possibility of a transfer to another floor. (Kelly Dep. at 205) Plaintiff testified that she mentioned to Kelly once during a phone conversation the possibility of a job on another floor. (Sparks Dep. at 204)

16. This element simply requires evidence that the employee is a man or woman. *Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir. 1982).

17. EEOC regulations define the type of conduct that may constitute sexual harassment: "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ..." 29 C.F.R. § 1604.11(a) (1991). Courts have also allowed harassment actions based on a "nonsexual" harassing act.

## Discussion

Plaintiff's complaint alleges four grounds for the Hospital defendant's liability: (1) sexual harassment; (2) tort of outrage; (3) invasion of privacy; and (4) assault and battery.

### A. Sexual Harassment

■ Title VII prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the work place with respect to "compensation, terms, conditions or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). Courts recognize two forms of sexual harassment: quid pro quo sexual harassment and hostile work environment sexual harassment. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989).

■ Quid pro quo sexual harassment exists when "submission to [sexual] conduct is either explicitly or implicitly a term or condition of an individual's employment," or when "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." Larson, 1 Employment Discrimination § 41.64(b), at 8–175 (quoting 29 C.F.R. 1604.11). An employee must prove four elements in order to establish a prima facie case of quid pro quo sexual harassment against an employer: (1) that the employee belongs to a protected group;[16] (2) that the employee was subject to unwelcome sexual harassment;[17] (3)

As stated in *McKinney v. Dole,* 765 F.2d 1129 (D.C.Cir.1985),

a continuing pattern of behavior that differentiates a particular employee or group of employees because of sex violates the equal "conditions of employment" requirement of Title VII. Clearly, then, if a supervisor consistently uses physical force toward an employee because of that employee's sex, the use of such force may, if pervasive enough, form an illegal "condition of employment." So too a pattern of mixed sexual advances and physical force may be illegally discriminatory if based on the employee's sex.

*Id.* at 1139. *See also Bell v. Crackin Good Bakers, Inc.,* 777 F.2d 1497 (11th Cir.1985) (Held that allegations of "threatening, bellicose, demeaning, hostile or offensive conduct" by a supervisor in the workplace because of the sex of

that the harassment complained of was based on sex; and (4) that the employee's reaction to the harassment complained of affected *tangible aspects* of the employee's compensation, or terms, conditions or privileges of employment.[18] *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1565 (11th Cir.1987). The employee must prove that her rejection of the harassment resulted in the deprivation of a job benefit which she was otherwise qualified to receive. *Henson,* 682 F.2d at 909.

With regard to employer liability, the *Henson* court held that in quid pro quo sexual harassment cases, "an employer is *strictly liable* for the actions of its supervisors that amount to sexual discrimination or sexual harassment resulting in tangible job detriment to the subordinate employee." *Id.* at 910 (emphasis added). In other words, the plaintiff need not prove that the employer knew or should have known of the harassment in question and failed to take prompt and appropriate remedial action. *See Sparks,* 830 F.2d at 1564 n. 22. The rationale behind imposing strict liability on the employer in quid pro quo cases comes from agency theory.[19] In the typical case of quid pro quo sexual harassment, the harassing supervisor acts within the scope of his actual or apparent authority to hire, fire, discipline or promote to extort the desired sexual consideration from the employee. *Henson,* 682 F.2d at 910. "Be-

cause the supervisor is acting within at least the apparent scope of the authority entrusted to him by the employer when he makes employment decisions, his conduct can fairly be imputed to the source of his authority." *Id.* Prompt and appropriate remedial action by the employer after discovering the quid pro quo harassment may mitigate damages, but will in no way affect the employer's liability. *Id.* at 910 n. 19; *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1514 n. 8 (11th Cir.1989).

Hostile work environment sexual harassment involves conduct which unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). Hostile work environment sexual harassment differs from quid pro quo harassment in that the harassment is *not* directly linked to the grant or denial of a tangible job benefit. *Id.*

An employee must prove the following elements to establish a prima facie case of hostile work environment sexual harassment: (1) that the employee belongs to a protected group;[20] (2) that the employee was subject to unwelcome sexual harassment;[21] (3) that the harassment complained of was based on sex; and (4) that the harassment complained of affected

the victim of such conduct stated a claim for Title VII sexual harassment.)

**18.** To create liability under the quid pro quo theory of sexual harassment, "the acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment." *Henson,* 682 F.2d at 909.

**19.** Title VII defines "employer" as a "person engaged in an industry affecting commerce ... and any agent of such a person." 42 U.S.C. § 2000e(b). Title VII does not, however, define the term "agent." Courts have looked to common law agency principles to determine when an agency relationship exists. It is a general rule of agency that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." *Sparks,* 830 F.2d at 558 (quoting Restatement (Second) of Agency § 219(1)). In order to be

"acting in the scope of his employment," the servant's conduct must (1) be of the kind he is employed to perform; (2) occur substantially within the authorized time and space limits; and (3) be actuated, at least in part, by a purpose to serve the master. Restatement (Second) of Agency § 228(1). Using these common law principles of agency, the *Sparks* court held that "a supervisor acts as an 'agent' of the employer for Title VII purposes, thus rendering the employer directly liable for the supervisor's actions, 'where [the] supervisor exercises the *authority actually delegated* to him by his employer, by making or threatening to make decisions affecting the employment status of his subordinates." *Sparks,* 830 F.2d at 1559 (quoting *Vinson,* 477 U.S. at 70, 106 S.Ct. at 2407) (emphasis added).

**20.** *See supra* note 16.

**21.** *See supra* note 17.

a "term, condition, or privilege" of employment in that it was "sufficiently severe or pervasive to 'alter the condition of [the victim's] employment and create an abusive working environment.'"[22] *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405–06 (quoting *Henson*, 682 F.2d at 904). The phrase "terms, conditions, or privileges of employment" includes the state of psychological well-being at the work place. Therefore, under certain circumstances, the creation of an offensive or hostile work environment due to sexual harassment can violate Title VII "irrespective of whether the complainant suffers tangible job detriment." *Henson*, 682 F.2d at 901; *see also Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905 (11th Cir.1988) (Plaintiff who alleges discrimination by sexual harassment does not have to demonstrate a "tangible loss" of an "economic character" in order to prove a violation of Title VII.)

▮▮▮ Employer liability in hostile work environment sexual harassment cases exists only when the corporate defendant knew or should have known of the harassment.[23] *Steele*, 867 F.2d at 1316; *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1512 (11th Cir.1989). An employer is absolved from liability if it takes prompt and appropriate remedial action in response to the harassment. *Steele*, 867 F.2d at 1316; Larson, 1 Employment Discrimination § 41.65(c), at 8–202. The burden is on the plaintiff to prove all essential elements. *Henson*, 682 F.2d at 905. The plaintiff can demonstrate that the employer knew or should have known of the harassment "by showing that she complained to higher management of the harassment, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* (citations omitted). Lack of actual knowledge may not insulate an employer; knowledge may be imputed if the harassment is so severe and pervasive that a reasonable employer would be inspired to investigate and discover the facts.[24] Larson, supra § 41.65(c), at 8–202; *Hall v. Gus Const. Co., Inc.*, 842 F.2d 1010, 1016 (8th Cir.1988).

▮▮▮ In cases of both quid pro quo and hostile work environment sexual harassment—ie. when a supervisor creates a hostile work environment *and* either makes or

---

**22.** Whether sexual harassment at the work place is *sufficiently severe and persistent* to affect seriously the psychological well-being of an employee is a question to be determined with regard to the totality of the circumstances. *Henson*, 682 F.2d at 904.

**23.** The *Henson* court gave a detailed explanation why the two types of sexual harassment cases require different treatment of respondeat superior.

In the classic *quid pro quo* case an employer is strictly liable for the conduct of its supervisors, while in the work environment case the plaintiff must prove that higher management knew or should have known of the sexual harassment before the employer may be held liable. The rationale underlying this difference in the treatment of the two cases is easily stated. The environment in which an employee works can be rendered offensive in an equal degree by the acts of supervisors, or even strangers to the work place. The capacity of any person to create a hostile or offensive environment is not necessarily enhanced or diminished by any degree of authority which the employer confers upon that individual. When a supervisor gratuitously insults an employee, he generally does so for his reasons and by his own means. He thus acts

outside the actual or apparent scope of the authority he possesses as a supervisor. His conduct cannot automatically be imputed to the employer any more so than can the conduct an ordinary employee.

\* \* \* \* \* \*

The typical case of quid pro quo sexual harassment is fundamentally different. In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the quid pro quo. In that case the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He acts within the scope of his actual or apparent authority to "hire, fire, discipline or promote." Because the supervisor is acting within at least the apparent scope of the authority entrusted to him by the employer when he makes employment decisions, his conduct can fairly be imputed to the source of his authority.

*Henson*, 682 F.2d at 910 (citations omitted).

**24.** Therefore, plaintiff's failure to notify the Hospital about the harassment as provided in the Hospital's sexual harassment policy does not, in and of itself, insulate the Hospital from liability. *Vance*, 863 F.2d at 1513.

threatens to make decisions affecting the employment status of the employee—the employer is strictly liable. *Steele*, 867 F.2d at 1317. However, in a pure hostile work environment situation, the plaintiff must prove that the defendant knew or should have known.[25]

Plaintiff alleges in his complaint both quid pro quo and hostile work environment sexual harassment. In an order (1/7/92) denying defendant Garland's Motion for Summary Judgment, this court declined to determine by way of summary judgment whether Garland's conduct translated into hostile work environment sexual harassment. The court stated:

Said defendant has offered substantial evidence that all in the work environment knew that the work atmosphere was only playful and fun-loving and that plaintiff willingly joined in the frolic. On the other hand, plaintiff offers evidence of conduct, statements, etc. which, unless deemed by a fact-finder to be acceptable under the circumstances, could be deemed to be harassment. Conduct and statements which could be deemed hostile and harassing under one circumstance, could be deemed otherwise under another circumstance. While cursing and unpleasant conduct does not *automatically* translate into sexual harassment, this court cannot determine, as a matter of law, the circumstance here.

The court did not specifically address the question of quid pro quo sexual harassment in its 1/7/92 order.[26] After analyzing all of the evidence filed in this case contemporaneous with the Hospital defendants' motion for summary judgment, the court concludes that plaintiff was not the victim of quid pro quo sexual harassment. The evidence clearly establishes that Garland never demanded sexual favors from plaintiff as a quid pro quo for job benefits nor made submission to sexual conduct a term or condition of plaintiff's employment. It is undisputed that Garland never in fact demanded any sexual favors from plaintiff. Plaintiff concedes in her deposition that Garland never touched her in a sexual way, had sex with her, demanded sexual favors, or told her that her job would be affected if she did not do something sexual with him. Garland's alleged misconduct consisted only of sexual comments and jokes directed at plaintiff, offensive language, and instances of rough contact. This type of conduct is more representative of hostile work environment sexual harassment. Plaintiff's submission to or rejection of this conduct was never a quid pro quo to job benefits.[27]

The Eleventh Circuit's decision in *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir.1989), supports this conclusion. In *Steele*, a supervisor engaged in sexually-oriented joking with the employees, requested sexual favors from them, made sexually suggestive comments about their attire, and asked them to visit him on the couch in his office. At the same time, the supervisor managed strictly, combined job duties, made them account for their time, and confined one employee to her desk. The court held that the company should not be strictly liable because there was no quid pro quo sexual harassment. According to the court, the changes in working conditions did not result from the supervisor's harassment. *Steele*, 867 F.2d at 1316. The court concluded that the su-

---

**25.** In a pure hostile work environment situation, no quid pro quo exists and the supervisor does not act as the agent of the employer—the supervisor acts outside the scope of his actual or apparent authority to hire, fire, discipline or promote. *Id.* at 1316.

**26.** Garland's brief, etc. was geared more toward asking the court to weigh the facts regarding the environment. The court does not recall significant focus being brought to the *quid pro quo* claim except in the motion itself. Unless the plaintiff can demonstrate to the court otherwise, it would appear to be inconsistent for there to be a *quid pro quo* claim as to Garland, but not as to the Hospital defendants.

**27.** We live in an era in which every plaintiff and his or her attorney feel "duty" bound to make every imaginable claim whether the claim has arguable merit or not. All courts are constantly called upon to "refine" the issues. Rule 11 is not an appropriate procedure for dealing with such claims because it creates a life of its own. The only real answer is to impose automatic penalties. Some lawyers may profit from this needless process. The public is the victim.

pervisor "did not demand sexual favors as a quid pro quo for job benefits." *Id.*

There is also no evidence that Garland ever took any adverse employment action or altered plaintiff's job conditions as a result of plaintiff's response to his harassment. Plaintiff contends that Garland was capable of affecting *tangible aspects* of the plaintiff's compensation, or terms, conditions or privileges of employment. According to plaintiff, the evidence establishes that Garland had some influence over hiring and firing decisions, salary increases, and transfers, and Garland used this influence to adversely affect plaintiff's employment after she complained about his behavior. While Garland did begin strictly documenting everything employees did wrong, threatened to write the histotech registry board, requested that plaintiff be written up for poor work quality, and requested plaintiff to be disciplined for tardiness, there is no evidence that any of these actions ever tangibly affected plaintiff's employment. In addition, while Garland could offer advice and recommendations as to personnel decisions, the evidence is undisputed that the Hospital and Board had the final say as to personnel decisions. There are a number of instances on record which demonstrate that Overstreet frequently ignored Garland's recommendations. For example, Overstreet refused to write plaintiff up for poor work quality and not following proper lab procedures, and refused to discipline plaintiff for tardiness. While Garland had some input into personnel decisions, the Hospital and Board were clearly the final decision-makers with regard to personnel discipline and employment. Therefore, not only did Garland not take any actions which tangibly affected plaintiff's employment, he also was not individually capable of affecting tangible aspects of the plaintiff's compensation, or terms, conditions or privileges of employment.

The question remains whether the Hospital defendants can be liable for Garland's alleged hostile work environment sexual harassment. As mentioned above, an employer cannot be held strictly liable for pure hostile work environment sexual harassment. In order to hold the employer liable, the plaintiff must establish that the Hospital knew or should have known about Garland's alleged sexual harassment and failed to take prompt and appropriate remedial action. In the course of its analysis, the court must look at two time frames: (1) prior to plaintiff's complaint in March 1991; and (2) after plaintiff's complaint in March 1991.

### 1. *Prior to Plaintiff's Complaint in March 1991*

Plaintiff contends that the following evidence proves that the Hospital knew, or should have known, of Garland's alleged sexual harassment prior to March 1991. First, Carolyn Feltman told Overstreet some two years before plaintiff's complaint that "there would be a sexual harassment case on their hands against the hospital if something was not done to stop the behavior of Dr. Garland" toward plaintiff and other female employees. (Feltman Declaration 12/3/91) According to Feltman, Overstreet took no action at that time. Second, Linda Smith had complained to Overstreet some time in 1989 that Garland had been harassing Hospital employee Debra Pettus by punching her in the arm. (Smith Declaration 12/3/91 [28]) Third, Overstreet saw plaintiff on many occasions crying in the break room and would say, "he's at it again, isn't he." (Sparks Dep. at 45, 128) According to plaintiff, Overstreet "was aware of everything that was going on." (Sparks Dep. at 71) Overstreet contends that he saw plaintiff crying *after* Garland hollered at her in the hallway in March 1991. (Overstreet Dep. at 28) Overstreet also testified that although he had heard about the "playful" rubber band fights prior to plaintiff's complaint, he never witnessed them. (Overstreet Dep. at 29, 33) According to Overstreet, he never had a conversation with anyone concerning Garland and his treatment of female employees prior to March 1991. (Overstreet Dep. at 22–23)

**28.** Feltman's and Smith's declarations were not sworn declarations. The court's decision(s) are not, however, made without a consideration of these statements.

This issue is perhaps closer than others. In view of the court's having to consider all of the claims, some unnecessarily so, the court will reserve ruling on the particular issue of the circumstances which occurred prior to March 1991 and will give the parties an opportunity to brief it further so that better focus can be brought to it.

### 2. Following Plaintiff's Complaint in March 1991

It is undisputed that plaintiff complained to Hospital administrators in March 1991 about Garland's alleged sexual harassment. The question is whether the remedial action taken by the Hospital after plaintiff complained was prompt and appropriate. Plaintiff contends that the Hospital's response was ineffective because (1) it did not prevent retaliation against her and others, and (2) the Hospital did not transfer her to another floor where she would have no contact with Garland. Plaintiff argues that she was constructively discharged as a result of the Hospital's failure to take adequate remedial action.

▆▆ The court concludes that the Hospital's response to plaintiff's complaint was both appropriate and prompt after March 1991, and effectively prevented any retaliation or future harassment by Garland against plaintiff and other employees. When plaintiff complained of the alleged harassment, the Hospital quickly investigated the complaint, discussed its findings with plaintiff and Garland, instructed Garland to stop the harassment, and made adjustments in plaintiff's work schedule so as to avoid future harassment. For the next two months there were no reports or complaints of further harassment by Garland. In May 1991, plaintiff registered another complaint against Garland charging him with threatening retaliation. The Hospital again promptly investigated the complaint, took steps to prevent retaliation by Garland, and expressly warned him that any future retaliation or harassment would result in the termination of his association with the Hospital. Plaintiff has offered no evidence of instances where Garland in fact retaliated against her. Every attempt by Garland to take adverse action against plaintiff was thwarted by the Hospital. Therefore, the court concludes that the Hospital's response to plaintiff's complaint was effective in stopping both retaliation and future harassment against her and others. *See Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1531 (M.D.Fla.1991) (An employer can successfully defend its response by showing that the conduct brought to its attention was not repeated after it took action). Plaintiff has not established that her "working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Steele*, 867 F.2d at 1317. *See also Hill v. Winn Dixie Stores, Inc.*, 934 F.2d 1518 (11th Cir.1991).

▆▆ The court also rejects plaintiff's argument that the Hospital's failure to transfer her to another floor in effect constructively discharged her. Plaintiff was given the choice of either remaining a histotech [29] or returning to her former job as a venipuncturist at the same pay and on the same shift. Plaintiff rejected both of these choices. According to plaintiff, she would still have had frequent contact with Garland in either of these positions and would have had to work in an intolerable work environment.

The court concludes that plaintiff's return to either position would not have been so intolerable that a reasonable person in plaintiff's shoes would have felt compelled to resign. *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987). First of all, there is no evidence that Garland's alleged harassment of plaintiff continued after March 1991. Second, the Hospital took strong measures to insure that Garland would not retaliate against plaintiff following plaintiff's complaint in May 1991. The Hospital's remedial measures were designed to end all future sexual harassment and retaliation. Plaintiff should have given these measures a chance to work. *See Garner*, 807 F.2d at 1539. The court rejects plaintiff's contention that

---

**29.** The court assumes that as a histotech, plaintiff would continue to have the same work schedule adjustments which were implemented in March 1991.

a transfer to another floor or the firing of Garland were the only appropriate remedial actions.[30]

## B. State Law Tort Claims

Plaintiff has alleged three state law torts claims against Garland and the Hospital defendants. First, plaintiff alleges that Garland outrageously and intentionally inflicted emotional distress upon plaintiff by subjecting her to abusive, harmful, hurtful touching, and abusive, profane, insensitive and unprofessional language. Second, plaintiff alleges that Garland invaded her privacy by speculating in her presence and in public about her personal life. Third, plaintiff alleges that Garland committed assault and battery against her by subjecting her to numerous unwanted touchings, such as shooting and throwing things at her, bumping into her, and closing a door into her.

The court has declined to decide on summary judgment whether Garland is liable for these alleged torts. The alleged liability of the Hospital defendants, however, provide additional issues which can be addressed on motion for summary judgment.

 Under Alabama case law, an employer is liable for the torts of an employee (1) if the employee was acting within the line and scope of his employment or (2) if the employer ratified, confirmed, or adopted the unauthorized wrongful conduct of the employee. *Moman v. Gregerson's Foods, Inc.*, 570 So.2d 1215, 1216 (Ala. 1990). An employee's conduct is not within the scope of employment if it is "impelled by motives that are wholly personal, or to gratify his own feelings or resentment." *Doe v. Swift*, 570 So.2d 1209, 1211 (Ala. 1990). Numerous Alabama cases have held that sexual conduct by an employee is purely personal and outside the line and

scope of his employment. *Id.* The court concludes that Garland was not acting within the line and scope of his employment when he allegedly sexually harassed plaintiff and submitted her to unwanted touchings. Such conduct was clearly not within the scope of his employment and was motivated for reasons wholly personal to Garland.[31]

 The court also concludes that the Hospital defendants did not ratify Garland's conduct. An employer can only be found to have ratified the employee's conduct if it is found to have knowledge of the alleged misconduct. *Moman*, 570 So.2d at 1216. Plaintiff must prove that the Hospital defendants knew or should have known about the *specific* torts alleged and ratified them. Plaintiff has offered no evidence establishing that the Hospital knew or should have known that Garland committed the specific torts alleged, or, certainly, that it ratified them. Even though Overstreet admits that he was aware of the rubber band battles, he testified that he believed them to be "playful." Considering that plaintiff and others participated in the rubber band fights, the Hospital defendants cannot be implicated with knowing that a tort was being committed. Once the Hospital learned about the specific incidents in March 1991, it took prompt actions to insure that such conduct ceased. Therefore, the Hospital defendants' motion for summary judgment on plaintiff's state tort claims will be granted.[32]

---

**30.** Plaintiff's demands do not establish *ipse dixit* reasonable standards. No reasonable employer would have been more responsive or solicitous. Plaintiff is not entitled to her version of perfection.

**31.** The court need not address whether Garland, as an independent contractor, could subject the Hospital to tort liability under any circumstances.

**32.** On its previous consideration of Garland's Motion For Summary Judgment, this court did not adequately separate its consideration of the *quid pro quo* claim(s) and the hostile environment claims. Garland may, if he wishes, seek a reconsideration of the *quid pro quo* ruling.