Michael Eden COTTLE, derivatively and individually and in a representative capacity, Plaintiff–Appellant,

v.

STORER COMMUNICATION, INCORPORATED, an Ohio Corporation, Nominal Defendant–Appellee.

Kenneth L. Bagwell, et al., Defendants–Appellees.

Michael Eden COTTLE, Plaintiff–Appellant,

v.

STORER COMMUNICATION, INC., an Ohio corporation, Nominal Defendant–Appellee,

Kenneth L. Bagwell, et al., Defendants–Appellees.

Nos. 87–5669, 87–5805.

United States Court of Appeals, Eleventh Circuit.

July 14, 1988.

Marshall Patner, Robert A. Holstein, Holstein, Mack & Dupree, Chicago, Ill., for plaintiff-appellant.

Earl D. Waldin, Jr., Kelley, Drye & Warren, Miami, Fla., for Storer.

Fredric J. Zepp, Latham & Watkins, New York City, Jonathan Rosenberg, Michael J. Chepiga, Simpson, Thacher & Bartlett, New York City, for Kohlberg, Kravis & Roberts.

Before FAY and VANCE, Circuit Judges, and HOFFMAN [*], Senior District Judge.

VANCE, Circuit Judge:

This is a shareholder derivative action involving white knights, poison pills, shark repellants, stalking horses, crown jewels, hello fees, goodbye fees and asset lock-up options. The district court granted summary judgment in favor of the defendants. Although summary judgments should be granted sparingly in these kinds of cases, we believe that this is a case where summary judgment is appropriate. We therefore affirm.

## I.

Storer Communications, Incorporated, an Ohio corporation, was a family run company which originally owned radio stations, and eventually expanded into broadcast and cable television. Although Storer became a publicly held corporation in the 1950s, the Storer family continued to play an active role in the company's management, retaining approximately seven to eight percent of the total equity. At the time of the events involved in this case, Peter Storer, whose father had founded the company in 1922, was the corporation's chairman and chief executive officer.

In March 1985 a dissident group of stockholders known as the Coniston Group announced publicly that it would solicit proxies for nominees to Storer's board of directors. The Coniston Group sought to elect directors to Storer's board to implement a liquidation and distribution of all the company's assets. Storer's directors retained Dillon Read & Company to advise them on the options and procedures relating to the Coniston Group's acquisition of shares and proxy challenge, including consideration of various shark repellants and a search for a possible white knight. On March 28, 1985 the board determined that the Coniston Group's liquidation proposal was not in the best interests of the shareholders.

In late March and April, George Wiegers, managing director of Dillon Read, contacted twenty-two potential purchasers of Storer. Weigers provided confidential information to twelve of these potential white knight investors, including Kohlberg, Kravis, Roberts & Company (KKR) and Comcast Corporation (Comcast).

KKR moved first. On April 22, KKR offered to purchase Storer for a per share price of $75 cash, plus one share of preferred stock with a $25 liquidation preference. KKR also asked for a $3 million "hello fee" in consideration of KKR's preparation and submission of the offer,[1] and an $18 million termination or "goodbye fee" payable if the companies failed to consummate the merger for reasons other than KKR's failure to obtain financing. The offer also included management participation in the new company.

The Storer board rejected KKR's offer as inadequate. Instead, the board voted to adopt a recapitalization program in which the corporation would offer to repurchase up to six million Storer shares. After Storer's major institutional shareholders expressed disapproval of the recapitalization, the board withdrew its plan and dropped the idea. KKR simultaneously improved its April 22 offer by including warrants to purchase up to ten percent of the surviving company. After receiving the advice of its advisors, Storer's board accepted the re-

---

[*] Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

[1]. A "hello" or engagement fee is a protective device that allows a bidder to profit to some degree from its efforts, and avoid becoming a mere "stalking horse" in an impending battle between another bidder and the target corporation. *See Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 269 (2d Cir.1986).

vised offer on April 25 by a vote of six to zero.[2]

At the corporation's annual shareholder meeting in May, Paul Tierney spoke on behalf of the Coniston Group, also known as the Committee for Full Value. According to the minutes, Tierney stated that the KKR agreement was a substantial step towards ensuring that the shareholders would receive full value for their shares, but that there might be other bidders besides KKR. He stated that the Coniston Group's nominees, if elected, would encourage other bidders to come forward quickly. He concluded that if the KKR offer turned out to be the best offer, the Coniston Group nominees would use every effort to close the KKR–Storer merger in the way that would maximize the value of Storer shares.

The shareholders elected four Coniston Group directors to the board. The new board thus contained seven outside directors, four of them from the Coniston Group, and only two inside directors, Peter Storer and Terry Lee.

All was quiet on the merger front until July. On July 16, 1985 Comcast sent a merger proposal to the Storer board. Comcast offered to purchase Storer for a per share price of $82 in cash, 1.2 shares of preferred stock with a $25 liquidation preference of the surviving company, and 1.2 warrants to purchase common stock of the surviving company. In terms of management incentives, the Comcast offer provided that Peter Storer would remain as chairman of the board, the company would remain independently run, and Comcast would honor all existing contracts with management. The offer included a stock lock-up provision, which would give Comcast a stock option on 3,470,000 newly issued Storer shares, exercisable in the event

another bidder subsequently acquired Storer for a higher price. The proposal also included a no-shop clause prohibiting Storer from soliciting other bids.

Over the next ten days, the parties met to confer, compare and negotiate. Dillon Read met with Comcast, Storer met with Dillon Read, Comcast met with Storer.[3] The Storer board then advised both Comcast and KKR that it would meet on July 29 to consider and review any and all current and revised offers.

On the morning of July 29 both bidders presented revised offers. Comcast increased its cash offer to $83.50 per share, plus .353 of preferred stock with a liquidation preference of $25, and $35 principal amount of twelve year subordinated zero coupon debentures.[4] The offer included the right to receive, within 180 days after the merger, the net proceeds from the underwritten sale by Merrill Lynch Capital Markets of an additional .517 shares of such preferred stock or, at Comcast's option, approximately $5.25 per share in cash. Comcast removed the stock lock-up provision included in its July 16 offer, but added an $18 million goodbye fee. The revised offer retained the no-shop clause and management commitments. Comcast indicated that it would hold the offer open until 5:00 p.m. the next day, and expressed its desire to continue negotiating with Storer.

KKR increased its cash offer to $90 per share, plus one merger warrant. The revised KKR offer retained the $18 million goodbye fee, and added an asset lock-up provision in the form of an option to purchase either Storer's cable stations for $835 million, or three of Storer's television stations for $535 million. KKR held the offer open until 5:00 p.m. that day.

2. Storer had a nine member board of directors. Five outside directors voted to accept KKR's offer at the April 25 meeting. The sixth outside director missed the meeting but later gave his approval. The three interested directors, Peter Storer, Terry Lee and Kenneth Bagwell, all abstained because of the possibility that they might retain management and equity interests in the new company.

3. Storer's legal advisor, Simpson, Thacher & Bartlett, was present at the meeting with Storer and Dillon Read.

4. These are bonds that pay no current interest income, but pay full face value principal at maturity. They are generally subordinate to all secured financing, but senior to common and preferred stock.

In the afternoon the board met for two and a half hours to discuss the two offers with its legal and financial advisors. By 4:00 p.m. the board had reached a consensus that KKR's offer was preferable for three reasons: (1) KKR offered a higher cash value per share, (2) Comcast's offer contained several uncertain tax consequences, and (3) there was a greater risk of missing the closing deadline in Comcast's proposal. The board then met again with KKR, and within fifteen minutes KKR increased its cash offer by one dollar to $91 per share, and increased the option price for the network television stations by $100 million to $635 million.

At 4:15 p.m. the Storer board reconvened. The two inside directors, Peter Storer and Terry Lee, stated that they favored approval of the KKR bid, and that they would forego the investment offered them by KKR if necessary to get the Storer board to accept KKR's proposal. The board then approved KKR's offer by a vote of seven to zero,[5] with Peter Storer and Terry Lee abstaining.

On October 23, 1985 the board issued its proxy statement prospectus, giving notice of a special shareholders' meeting on November 22, 1985 to vote on the Storer-KKR merger proposal, and urging shareholder approval. At the November 22 meeting, the shareholders approved the Storer-KKR merger by a vote of 15.3 million shares (approximately 99.3% of the votes cast, 81% of all shares outstanding) to 39,247 shares (approximately 0.7% of the votes cast, .25% of the shares outstanding), with 65,373 shares abstaining.

Meanwhile, while merger negotiations were proceeding on center stage, appellant Michael Cottle, a Storer shareholder and the plaintiff in this derivative action, had initiated a small skirmish with the Storer board. On July 3, 1985 Cottle made a demand on the board to investigate unidentified corporate officers and directors engaged in "entrenchment conduct" with respect to the proposed KKR merger transaction, and who were allegedly exposing Stor-

er to $21.2 million in liability. On July 19, the directors responded by asking Cottle to furnish additional information concerning his shareholder status and the basis of his allegations.

On November 11, in response to an October 21 invitation from the Storer board, Cottle met with counsel for the directors. Cottle demanded that the board seek a declaratory judgment regarding the validity of the Storer-KKR merger, and that the board postpone the upcoming special shareholders' meeting. The board refused. Cottle filed this suit on November 21, 1985, the day before Storer's shareholders voted to approve the Storer-KKR merger.

The district court denied the defendants' motion to dismiss, allowing the plaintiff reasonable time for discovery. After four months of discovery and additional briefing, the district court granted the defendants' motion for summary judgment. The plaintiff appeals.

## II.

Appellant argues that the district court erred in granting the defendants' motion for summary judgment. The defendants argue that the district court correctly granted summary judgment under the business judgment rule. Appellant responds with several reasons why the defendants are not entitled to the protection of the business judgment rule. We agree with the defendants, however, that appellant has failed to show that the business judgment rule does not apply.

Under the business judgment rule directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in fraud, bad faith or an abuse of discretion. *Mobil Corp. v. Marathon Oil Co.*, Fed. Sec. L. Rep. (CCH) ¶ 98,375 at 92,284 (S.D. Ohio) [available on WESTLAW, 1981 WL 1713], *rev'd on other grounds*, 669 F.2d 366 (6th Cir.1981) (quoting *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 382 (2d Cir.

---

5. Four of the seven votes came from the Coniston Group directors. The Coniston Group received $1.5 million in reimbursement for its expenses associated with the proxy fight.

1980)); *see Smith v. Van Gorkom,* 488 A.2d 858, 872–73 (Del.1985). "If the business judgment rule applies, there is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' " *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del.1986) (quoting *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). In the corporate takeover context, the business judgment rule applies once the directors have satisfied their duty "to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders." *Van Gorkom,* 488 A.2d at 873; *see Revlon,* 506 A.2d at 180.

■ In order to avoid a motion for summary judgment a nonmoving party with the burden of proof must produce evidence that shows there exists a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 2548, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While this evidence need not be in a form that would be admissible at trial, *Celotex,* 106 S.Ct. at 2553, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus Rule 56 requires the nonmoving party to affirmatively allege specific facts to demonstrate a genuine dispute. *Id.; see Commuter Transp. Sys., Inc. v. Hillsborough County Aviation Auth.,* 801 F.2d 1286, 1291 (11th Cir.1986).

The party opposing summary judgment before trial must show the existence of a genuine dispute of material fact in the context of any substantive evidentiary burdens of proof that would apply at a trial on the merits. *Liberty Lobby,* 106 S.Ct. at 2512; *see Romano v. Merrill Lynch, Pierce, Fen-*

*ner & Smith,* 834 F.2d 523, 527 (5th Cir. 1987); *Idaho v. Hodel,* 814 F.2d 1288, 1292–93 (9th Cir.1987); *Niagara of Wis. Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986). "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 106 S.Ct. at 2513.

The inquiry in this case necessarily implicates the business judgment rule, *cf. id.* at 2512, which protects the defendants from liability absent a clear showing of fraud, bad faith or abuse of discretion. Thus in the face of the defendants' motion for summary judgment, the plaintiff must allege specific facts that show a genuine issue of material fact concerning fraud, bad faith or abuse of discretion on the part of the Storer directors. We now consider the plaintiff's attempts to demonstrate four genuine issues of material fact concerning the directors' abuse of discretion.[6]

### A.

Appellant contends that the Storer directors abused their discretion by granting the asset lock-up to KKR on July 29. He argues that by giving KKR a choice of Storer's two crown jewels, Storer's cable operations or three of its television stations, the board hindered Comcast's ability to evaluate Storer's remaining assets, and thus effectively ended the bidding.

■ While lock-ups in a takeover situation are not per se illegal, they may be illegal in particular cases. *Hanson,* 781 F.2d at 273–74. The Second Circuit has noted that "some lock-up options may be beneficial to the shareholders, such as those that induce a bidder to compete for control of a corporation, while others may be harmful, such as those that effectively preclude bidders from competing with the optionee bidder." *Id.* at 274; *see Revlon,* 506 A.2d at 183. Thus, as a general rule, courts have held that lock-ups that draw new contestants into the bidding war are

---

**6.** The plaintiff does not allege that the defendants committed fraud or acted in bad faith, but only that the directors abused their discretion in negotiating the merger.

permissible, while lock-ups that tend to preclude new bidders or exclude hostile ones are not. *See Hanson,* 781 F.2d at 274; *Revlon,* 506 A.2d at 183; Note, *Lock-up Options: Toward a State Law Standard,* 96 Harv.L.Rev. 1068, 1081 (1983).

While this generalization can be helpful, it is not always determinative. As one commentator has observed:

> While this formulation has the virtue of appearing to encourage a desirable end—competitive bidding in acquisition transactions—it is not particularly helpful in determining the validity of any particular option because all lock-up options, by their nature, encourage the bid of the person receiving the lock-up and discourage the bids of all other persons.

Nachbar, *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.—The Requirement of a Level Playing Field in Contested Mergers, and its Effect on Lock-ups and Other Bidding Deterrents,* 12 Del.J.Corp. L. 473, 488 (1987) (footnote omitted).[7] All auctions must end sometime, and lock-ups by definition must discourage other bidders. *See id.* at 493. The question therefore is not whether the asset lock-up granted to KKR effectively ended the bidding process. The question is whether Storer conducted a fair auction, and whether KKR made the best offer. *See id.* at 493; *see also Edelman v. Fruehauf Corp.,* 798 F.2d 882, 886 (6th Cir.1986) (issue is whether target board fostered a real bidding process).

We note initially that, unlike the cases cited by appellant, this is not a classic hostile takeover case. While the takeover may not have been friendly, the Storer directors recognized that their duty had become to obtain the best price possible for the shareholders, rather than to defend "the corporate bastion." *Revlon,* 506 A.2d at 182; *see Edelman,* 798 F.2d at 886–87;

*Samjens Partners I v. Burlington Indus., Inc.,* 663 F.Supp. 614, 623–24 (S.D.N.Y. 1987). In fact, four of Storer's six outside directors were elected in May 1985 on this very platform. Procedurally, the Storer board's actions reflect this.

The granting of asset lock-ups must be viewed in the context of the entire negotiated transaction. *See Mobil Corp. v. Marathon Oil Co.,* Fed.Sec.L.Rep. (CCH) ¶ 98,375 at 92,285 (S.D.Ohio Dec. 7, 1981) [available on WESTLAW, 1981 WL 1713]. In this case, Storer's directors searched from March through July for potential bidders, but only two bidders indicated any interest. *See Hecco Ventures v. Sea-Land Corp.,* No. 8486 (Del.Ch. May 19, 1986), *reprinted in* 12 Del.J.Corp.L. 282 [available on WESTLAW, 1986 WL 5840]. The Storer board rejected KKR's first offer as inadequate. When Comcast made its first offer in July, which itself included a stock lock-up provision, rather than hastily grant lock-ups to either bidder, Storer negotiated extensively and deliberately with both parties. Storer did not grant KKR the lock-up until after both bidders had made full presentations at the July 29 meeting, and had presented their new offers.

These are not the kinds of actions that amount to an abuse of discretion. Storer's effort to find an investor was coming to a close, and the offers from the only two bidders were about to expire. It was time to end the auction.

In exchange for the asset lock-up, Storer ultimately received a cash price of $91 per share, $16 more per share than KKR's previous offer, and $7.50 more per share than Comcast's.[8] This improvement in the bid distinguishes *Hanson,* where the improvement was "at best one dollar and change" above the previous $72 cash bid, 781 F.2d at 281, and *Revlon,* where there was similarly "very little improvement" in

**7.** "Classifying a lockup as a permissible type that promotes bidding, or a harmful strain that discourages bidding, appears to be no more than conclusory judicial labels that are affixed by hindsight after the lockup has been scrutinized by the courts." Herzel, *Misunderstanding Lockups,* 14 Sec.Reg.L.J. 150, 177 (1986).

**8.** Comcast had offered $83.50 cash per share. The offer also included the right to receive at least an additional $5.25 per share within 180 days after the merger. This would make Comcast's total cash offer amount to $88.75 per share, or $2.25 per share less than KKR's successful $91 per share cash bid.

the subsequent bid. 506 A.2d at 183. It is undisputed, moreover, that the prices for the two asset options were reasonable, and appellant does not argue otherwise. Unlike *Hanson*, there is no allegation that the option price for either the cable operations or the television stations was outside of the range of fair value. *Cf. Hanson*, 781 F.2d at 280–81 (plaintiffs presented evidence to raise a very serious question that the optioned assets were significantly undervalued); *Revlon*, 506 A.2d at 183 (board sought a lock-up option to purchase target's two main assets at a substantial discount).

We therefore conclude that appellant has shown no abuse of discretion in the Storer board's grant of the asset lock-up to KKR. The business judgment rule thus prevents us from second guessing the directors' decision to grant the lock-up.

### B.

Appellant also argues that the directors' decision to accept the KKR bid on the afternoon of July 29 without resuming negotiations with Comcast was itself an abuse of discretion not protected by the business judgment rule, aside from the presence of the asset lock-up. Because Dillon Read apparently valued Comcast's July 29 bid $2.00 per share greater than KKR's bid, appellant contends that the directors' decision to accept the KKR bid without going back to Comcast constitutes an abuse of discretion.

■ This allegation, however, does not raise any factual issue that would preclude summary judgment on the basis of the business judgment rule. Appellant does not charge that the Storer directors' action amounted to fraud, as a result of self-dealing or otherwise. Appellant only challenges the directors' action on the basis of price inadequacy. *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 609–10 (Del.Ch.), *aff'd*, 316 A.2d 619 (Del.1974). To overcome the business judgment rule, however, such an allegation must be based on a gross inadequacy of price. *See id.* at 610.

■ We find no such gross inadequacy in this case. Though Dillon Read may have estimated that Comcast's overall price was slightly higher, KKR's cash offer was $7.50 per share higher. The directors also considered the KKR offer superior in terms of timing, tax consequences and financing. The business judgment rule exists to allow management to take these kinds of factors into account. *See, e.g., Terrydale Liquidating Trust v. Barness*, 642 F.Supp. 917, 928 (S.D.N.Y.1986) (loss of preferred tax status); *Freedman v. Restaurant Assoc. Indus., Inc.*, [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,502, at 97,220 (Del. Ch. Oct. 16, 1987) [available on WESTLAW, 1987 WL 14323] (likelihood that one of several alternative possible transactions may be less likely to close); *see also Keyser v. Commonwealth Nat'l Fin. Corp.*, 675 F.Supp. 238, 265–66 (M.D.Pa.1987) (under Pennsylvania law, directors may consider factors other than price, such as future dividends and social issues, in evaluating merger proposals); *Gelco Corp. v. Coniston Partners*, 652 F.Supp. 829, 850 (D.Minn.1986) (board of directors may consider factors other than price, including the nature and timing of the offer and risk of nonconsummation), *aff'd in part and vacated in part on other grounds*, 811 F.2d 414 (8th Cir.1987). KKR's offer was simply not so inadequate in price that we will second-guess the Storer directors' decision to prefer it over Comcast's offer. *See Gimbel*, 316 A.2d at 615.

### C.

■ Appellant's next attempt to identify an abuse of discretion involves the Storer board's continued use of Dillon Read as a financial advisor. Appellant argues that because Dillon Read had a prior working relationship with Storer, Dillon Read should have conducted an independent investigation of the financial information provided to it by Storer before advising the board during the merger negotiations. According to appellant, Dillon Read's financial analyses therefore were incomplete and cannot satisfy the directors' duty to gather and consider all material information diligently. Appellant cites *Hanson* and *Van*

*Gorkom* as support for his contention that the lack of an independent financial review constitutes an abuse of discretion.

It is difficult to see how these cases support appellant's position. *Hanson* is only marginally relevant on this point. That case involved the target directors' "paucity of information" and "swiftness of decisionmaking," 781 F.2d at 275, not the independence of their financial advisors. Appellant does not contend that the Storer board's consideration of Dillon Reads' advice was too cursory or inadequate, which is what *Hanson* is all about. *See also Edelman*, 798 F.2d at 886 (directors simply "rubber stamped" management's proposal).

In *Van Gorkom*, the board of directors of the target corporation hastily and without adequate information approved a cash merger at a price determined by the corporation's chairman and CEO on his own. The board made no effort to initiate any valuation study or documentation of the price as a fair measure of the company in a merger context. 488 A.2d at 876. Indeed there was no evidence at all that the chairman's valuation represented anywhere near the per share intrinsic value of the target. *Id.* at 866. Nevertheless, the court wrote:

> We do not imply that an outside valuation study is essential to support an informed business judgment; nor do we state that fairness opinions by independent investment bankers are required as a matter of law. Often insiders familiar with the business of a going concern are in a better position than are outsiders to gather relevant information; and under appropriate circumstances, such directors may be fully protected in relying in good faith upon the valuation reports of their management.

*Id.* at 876 (emphasis added).

The issue in this case is not whether it would have been a good idea for the Storer board to get independent financial advice, but whether the board abused its discretion by not doing so. Under *Van Gorkom*, the

Storer board need not necessarily have retained Dillon Read or any other outsider as an advisor. The fact that the board did consult Dillon Read simply weighs in favor of finding that the directors did not abuse their discretion.

We think that appellant's effort to graft a requirement of retaining an independent financial advisor as a prerequisite to invoking the business judgment rule is an unwarranted extension of the law. Thus appellant's allegations that Storer had a prior relationship with Dillon Read and that Dillon Read relied on financial information provided by Storer management are not legally sufficient to show an abuse of discretion. These allegations therefore create no material issue of fact to prevent summary judgment.

### D.

■ Appellant argues finally that the Storer directors abused their discretion and breached their fiduciary duty by granting KKR an $18 million termination or cancellation fee, payable in the event that the Storer board rejected KKR's bid in favor of a higher one.[9] Such agreements, analogous to liquidated damages provisions, have become common in the merger context. *See Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128, 1150 n. 7 (D.Or.1984). Termination fees, when reasonable in relation to the bidder's efforts and to the magnitude of the transaction, *see Samjens*, 663 F.Supp. at 625, are generally permissible, unless they are used in combination with other impermissible defensive tactics. Nachbar, *supra*, at 485; *see Revlon*, 506 A.2d at 184; *cf. Beebe*, 578 F.Supp. at 1150–51 (termination fee calculated as one percent of the transaction was reasonable and fully disclosed to shareholders in proxy statement); *Samjens*, 663 F.Supp. at 625 (breakup fee calculated as two percent of the value of the company was not so onerous as to end the auction).

*See Edelman*, 798 F.2d at 887.

---

**9.** Appellant similarly challenges the $11 million termination fee for KKR's investment banker.

Appellant makes no argument that the fees were in any way unreasonable in relation to the size of the transaction. The only evidence in the record is that the two fees amounted to just over one percent of the total acquisition price of nearly $2.5 billion, and were reasonable. Appellant merely contends that the Storer board did not conduct an investigation to determine if the fees were reasonable. This allegation is not sufficient to overcome the business judgment rule. The district court therefore appropriately granted summary judgment on this issue.

### III.

Appellant has failed to demonstrate the existence of any genuine and material factual dispute concerning the Storer directors' actions that could possibly support a claim that the directors abused their discretion. The directors are therefore entitled to the presumption that they acted properly in arranging the merger with KKR and presenting it to the shareholders for approval.[10] Summary judgment in their favor was therefore appropriate. The district court's judgment is

AFFIRMED.

---

10. Appellant also argues, almost as an afterthought, that Storer's proxy statement to the shareholders describing and recommending approval of the proposed Storer-KKR merger violated section 14(a) of the Securities Exchange Act of 1934. Appellant essentially argues that the proxy failed to disclose the same facts which formed the basis of appellant's abuse of discretion claim: the directors' acceptance of the KKR bid on July 29 without resuming negotiations with Comcast, and the relationship between Storer and Dillon Read. Because we have rejected the claim that these actions amounted to a state law breach of fiduciary duty, they do not constitute a violation of federal securities law. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 478–79, 97 S.Ct. 1292, 1303–04, 51 L.Ed.2d 480 (1977); *Hastings-Murtagh v. Texas Air Corp.,* 649 F.Supp. 479, 485–86 (S.D.Fla.1986). The district court therefore properly granted summary judgment for the defendants on the section 14(a) claim.