**FEDERAL DEPOSIT INSURANCE COR-PORATION, as Manager of the Federal Savings and Loan Insurance Corporation Resolution Fund, Plaintiff,**

v.

**Angelique O. STAHL, Ira C. Hatch, Ross P. Beckerman, W. George Allen, Ronald M. Bergeron, Sr., Allan E. Baer, and Ralph Cheplak, Defendants.**

No. 91–7122.

United States District Court,
S.D. Florida.

May 27, 1994.

Frank R. Rodriguez, Jorge L. Guerra, Miami, FL, for plaintiff FDIC.

Edward M. Kay, Kay & Bogenschutz, Ft. Lauderdale, FL, for defendant Stahl.

Ross P. Beckerman, pro se.

R. Michael Hursey, Allen, Hursey & Lucas, Ft. Lauderdale, FL, for defendant W. George Allen.

Ralph F. Cheplak, pro se.

*OMNIBUS ORDER ON DEFENDANTS' MOTIONS FOR DIRECTED VERDICT, MOTION FOR MISTRIAL AND MOTION TO DISMISS FOR MISCONDUCT*

(AMENDED ORDER)

FERGUSON, District Judge.

All of the defendants made motions for directed verdicts pursuant to Rule 50, Federal Rule of Civil Procedure, at the conclusion of the plaintiff's case, Because of the posture of the case when assigned to the undersigned judge, ruling was reserved. The motion was renewed at the conclusion of all the evidence, and ruling was again reserved to allow the jury to pass on the factual question, and to obviate the need for a new trial in the event the reviewing court disagreed with this court's determination on the factual and legal issues.

**BACKGROUND**

This case commenced on December 26, 1991, with the filing of a complaint alleging breach of fiduciary duty and simple negligence on the part of the directors and officers of Broward Federal, a failed savings and loan association.[1]

After hearings and rulings on discovery motions in early 1994, the parties commenced earnest settlement negotiations. To aid and expedite pretrial matters the Court suggested, and the defendants agreed, that two of their attorneys would alternate as lead or alternating counsel to coordinate depositions. When global negotiations reached an impasse, the FDIC commenced negotiations with the defendants individually and settled with three, including one who was represented by a designated lead counsel.

The remaining defendants complained, by *ore tenus* motion to dismiss, that settlement terms unfairly required the settling defendants to testify for the FDIC against the nonsettling defendants, and to deny pretrial assistance to the nonsettling defendants. Further, the nonsettling defendants claim that they were denied information obtained by lead counsel for the settling defendants, to their prejudice, while the attorneys were still acting as part of the team for all the defendants. The protests continued through the trial.

This trial commenced on April 19, 1994, and lasted over three weeks. The jury returned verdicts for the outside directors, George Allen and Ross Beckerman, finding no breach of fiduciary duty or negligence. It found the defendants Angelique Stahl and Ralph Cheplak liable for breach of fiduciary duty and negligence and assessed damages at $18.6 million, attributing 75% of the fault to Stahl and 25% to Cheplak.

The motions for directed verdict or new trial were addressed principally to the busi-

---

1. In the three-year period prior to trial substantial work had been done by predecessor judges in disposing of several motions, including a motion to dismiss and a motion for summary judgment.

ness judgment rule and the alleged misconduct of counsel for FDIC.

## DIRECTED VERDICT STANDARD

Federal law governs the propriety of motions for directed verdict and for judgment notwithstanding the verdict. *Miles v. Tennessee River Pulp and Paper Co.*, 862 F.2d 1525, 1528 (11th Cir.1989) Both motions raise only questions of law. *Dun & Bradstreet, Inc. v. Miller*, 398 F.2d 218, 223 (5th Cir. 1968).

█ The trial judge in considering those motions does not exercise discretion, but makes a ruling of law. The Eleventh Circuit in *Miles v. Tennessee River Pulp and Paper Co.*, 862 F.2d 1525, 1528 (11th Cir.1989), has previously delineated the standard for determining motions for directed verdict:

> The court should consider all of the evidence—not just that evidence which supports the non-mover's case-but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.

*Id.*

Moreover, the Eleventh Circuit has also recognized that a mere scintilla of evidence is insufficient to present a question for the jury. *Id.* There must be a conflict in substantial evidence to create a jury question. *Id.* It is within this framework that this Court considers the defendants' motion for directed verdict.

## EVIDENCE

Well into the trial, and based on the evidence presented, the Court narrowed the issue to whether there was negligence on the part of the two outside directors and two officers in approving seven commercial loans. Other prejudicial allegations or evidence of self-dealing or lack of qualifications, although not stricken, were rendered irrelevant.[2]

Key to the plaintiff's case, as evidence of negligence, was that defendant Broward Federal officials continued to make loans which violated a Supervisory Agreement[3] and R41(b)—FHLB, a controversial memo which purports to explain and expand a federal regulation on commercial loan underwriting procedures. According to one of the examiners, a total of forty-seven major real estate loans were made in the period covered by its nineteen-month reports. Twenty-three of those loans were reviewed. Seven of them failed.

All of the loans were made during a period when hundreds of savings and loans associations were failing, principally because of economic and real estate market conditions. Those failures in South Florida included such flagship institutions as AmeriFirst, Centrust, First Financial, and Flagler Federal. Deficient underwritings or failure to adhere to FHLB policy was not a factor in every case of institution failure. Examiners for the

---

**2.** The only allegations and proof of damages related to the seven loans. However, a portrait of general incompetence on the part of the defendant officers was painted by the FDIC with testimony of deficient qualifications and other transactions which did not result in losses. The jury's interest was obviously pricked as they requested documentation as to the heralded "Penn Square" transaction, only to learn that no documents regarding that transaction were in evidence. Expert witnesses named by both sides were stricken after the FDIC's proffer suggested, among other things, that its witness would have given opinions along the same line.

**3.** Broward Federal, through its officers and directors, entered into a written agreement drafted by the Federal Home Loan Bank Board (FHLBB), whereby Broward Federal agreed, among other things, to develop and adhere to "specific written loan and investment procedure," and to apply underwriting standards which the FHLBB "determined to be in compliance with the terms of [the] Agreement."

Further Broward Federal agreed to comply with certain underwriting guidelines established by the FHLBB, "as if such items were a part of the underwriting standards." In exchange the FHLBB agreed "to forbear from recommending the initiation of formal enforcement proceedings on the subjects covered by [the] Agreement," provided, however, that execution of the Agreement did "not preclude the FHLBB from taking supervisory action with regard to any additional matters" which it considered appropriate under the circumstances.

plaintiff/FDIC also admitted that a number of loans which were substandard by its "subjective" criteria did not fail.

This is not a case where there was total indifference to standard underwriting practices. Instead it is a case where persons, on different sides of a dispute, disagreed as to whether Broward Federal's underwriting practices were adequate, and whether the wiser course would have been to discontinue all commercial lending until regulators gave approval to the institution's underwriting practices. Criticisms of the seven subject loans included inadequate appraisals and insufficient borrower equity (Calusa Trace); appraisal not in compliance with R41(b) and no discount for lease-up period (Remington Steele); no audited financial statements and no proof of borrower equity (Mason Carter); no written personal guarantee and no sales history (Cypresswood); no support for highest and best use in appraisal and no feasibility study (Forest and Phillips).

FDIC witness Roslyn Hess, an FHLB examiner, gave an opinion that the six loans she examined were "substandard" by the Board's underwriting criteria. On cross-examination, however, she conceded that the Supervisory Agreement, by which the defendants were being measured, did not require audited financial statements; did not specify a certain liquidity for borrowers; and did not require market/feasibility studies in every case. In cases of commercial real estate loans, she concluded, the lender is guided by "prudence" as measured by industry standards. Significantly, she had no knowledge that Cheplak or Stahl benefitted personally from any of the loan transactions.

As to the Calusa Trace loans, she testified that based on the incomplete information available her office thought the loan was substandard; as to the Cypresswood loan she was not sure whether the appraisal was based on valid comparables; as to the Remington Steele loan she admitted that the length of a construction loan was significant to determining the adequacy of discount information but that she did not know the length of the loan; as to the Forest–Phillips loans she did not know whether either of the loans exceeded loan-to-value, or loan-to-borrower limits, or that any of the loans were approved without an appraisal.

Edmund Hittson, an independent banking consultant for the FDIC, testified as to the soundness of the loans based on appraisals conducted after the loans were already in default. Hittson had come to work for Broward Federal in 1987—several years after the loans were made. In his opinion there were cases where (1) the disbursal of loan proceeds exceeded the percentage of completed construction; (2) the project was on an inaccessible or incompatible site; (3) the appraisal was deficient for failure to consider need for state approval for development of regional impact; and (4) the guarantor lacked the ability to make good on the loans. His new appraisals—which looked to value independent of economic return factors when the loan was made—was for the purpose of writedowns and workouts.

While there may be a legitimate debate, looking back ten years, whether the officers exercised good judgment in approving and making some of the seven loans, there is no question that the officers were attentive, deliberate and motivated only by an effort to save the financially troubled institution.

George Murphy, a regulatory attorney who worked eleven years for the FHLB was hired as a consultant to assist management in correcting practices that were criticized by regulators. He testified that the institution had written and adopted good operating policies. He also knew that even when institutions comply with regulations they may still fail and disagreed with examiners that Broward Federal's underwriting practices failed to satisfy R41(b).

James Croft, business professor and former director in charge of all savings and loans examiners in the United States for two and one-half years, had also been hired by the defendants to assist in obtaining regulator approval of its management operations. Dr. Croft's office in the FHLB was responsible for editing, revising, issuing and continually explaining R41(b). The controversy about the memo—which was directed to examiners—is that it was too subjective. The appraisal industry's specific criticism of the

memo, he noted, is that it attempted to raise industry standards for evaluating the worth of property in a nonpractical way. With respect to Broward Federal's policies, he noted that they were "very well done." His assessment of the management team was "above average," honest, attentive, interested and aware of what was going on. His advice to directors and officers was to be forthright in dealing with regulators—which advice they followed more so than any other client he had at the time.

As a consultant, with extensive business and regulation experience, Croft said he did not advise the defendants to cease all commercial lending activities while strengthening underwriting practices, but on "hindsight" he probably should have advised a shut-down considering the eventual consequences.

The defendant Cheplak, Chief Operating Officer, presented a very credible defense without the assistance of counsel. When he was hired in 1983, he brought in a new comptroller and a new loan officer. He saw the deficiencies noted by regulators as "growing pains" of an institution, like other savings and loans, moving suddenly into the new higher-risk commercial loan markets—enticed by tax incentives created by new legislation, and compelled by looming financial distress to increase income. Spiraling interest rates had opened a gap between what the institution had to pay in order to attract depositors, and its earnings from low-interest 30-year fixed rate home mortgages which made up 90% of its portfolio. According to Cheplak, survival meant converting from a mutual to stock-owned institution and aggressive increase in short-term commercial lending, or both. The first option was foreclosed, effectively, by the Supervisory Agreement which would have made stock offerings unmarketable.

Broward Federal's plight, he testified, was created in large part by deregulation, the same as that of several hundred savings and loans institutions which failed across the nation. Broward Federal's underwriting practices, he said, were not much different from those of the institution where he previously worked as senior vice president. Many loans found to be safe by regulators failed. Some that were found substandard did not go into default. The ex-thrift administrator, who is currently a college professor, gave a sound and unrefuted explanation as to how the early 1980's legislative inducements to commercial lending gave way to legislative disincentives in the mid–80's and a near-depression in the real estate market which caused developers to walk away from completed as well as incompleted projects.[4]

He also discredited the theory of regulators, as suicidal, that the more prudent course would have been to shut down all commercial lending until examiners decided, in its slow and subjective fashion, whether the underwriting policies and practices of Broward Federal satisfied R41(b). In sum, all along the way the defendant managers were making deliberate choices, using the advice of the best consultants to be found, and taking action to save the institution in economic bad times. There was no evidence that they stood to benefit personally from any of the transactions which are the subject of this lawsuit.

## STANDARD FOR DETERMINING DIRECTOR LIABILITY

At the close of the FDIC's case, the Court heard extensive argument on the appropriate

---

4. "Deregulation" was first mentioned by the FDIC through a staff memo referred to by examiner Debra Paradice. It noted a "deregulated savings environment" and its impact of "additional responsibilities placed on board members." The term, not defined in the course of the trial means, "reduction of government regulation of business to permit freer markets and competition." Black's Law Dictionary 443 (6th Ed. 1990).

Cheplak's opinion that deregulation, (along with fraud and mismanagement), contributed to savings and loans disaster is shared by respecta-

ble authority—including Edwin Gray, former chairman of the Federal Home Loan Bank Board. *See* Gregg Fields, *Deregulation Helped Turn S & L Problem Into Crisis*, MIAMI HERALD, Feb. 19, 1989, at 29A; Kevin Phillips, Politics of Rich and Poor 91–101 (Random House 1990); David Satterfield, *Regulation or Deregulation? Experts Differ On Solutions*, MIAMI HERALD, Aug. 12, 1987, at 1A.

Nevertheless, whether the conduct of these bank officers caused the demise of Broward Federal or contributed to the national savings and loan crisis was not the issue in this case.

standard for determining director liability. Defendants argued that directors of a failed bank institution could only be held liable for acts constituting "gross negligence"; plaintiff argued that under Florida common law, directors could be held liable for acts constituting "simple negligence."

The alleged acts of negligence in this case occurred prior to the enactment of either federal[5] or state[6] "insulating" statutes; therefore, the state of Florida common law pre–1987 became the central focus. Judge Ryskamp, who heard pretrial motions in this case, held that the Florida common-law standard of care which imposed personal liability upon directors and officers for simple negligence, applied in this case.[7] *See also FDIC v. Gonzalez–Gorrondona,* 833 F.Supp. 1545 (S.D.Fla.1993) (pre–1987, Florida imposed liability on corporate directors and officers for simple negligence); *FDIC v. Haddad,* 778 F.Supp. 1559 (S.D.Fla.1991) ("[The] position that in general there is no cause of action against corporate directors under Florida law for 'simple negligence' is unfounded."); *But see FDIC v. Mintz,* 816 F.Supp. 1541 (S.D.Fla.1993). (simple negligence claim against corporate officers cannot survive under business judgment rule). Judge Ryskamp's ruling became the law for the remainder of this case.

### BUSINESS JUDGMENT RULE

■ At the charge conference, the FDIC requested instructions which would have permitted the jury to find negligence on the part of the defendants for not complying with internal memorandum R–41(b) and the Supervisory Agreement. That requested in-

struction was denied on grounds that neither the rule nor the agreement fixed a legal standard by which the conduct of the defendants was to be measured. Argued extensively outside the presence of the jury was the mechanics of the business judgment rule, and how the jury should be instructed.[8] As argued by counsel for the FDIC, essentially, the defendants were not entitled to the presumption because of evidence of a failure to exercise due care. That lack of due care was based primarily on the examiner's opinion of a failure to follow the controversial memo or noncompliance with the Supervisory Agreement.

After revisions which met approval of the FDIC, and "90%" approval by the defendants, the jury was given the following instruction on the business judgment rule:

### JURY INSTRUCTION NO. 11 BUSINESS JUDGMENT RULE

The law will not hold directors liable for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith. This is known as the business judgment rule. If the business judgment rule applies, there is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the corporation.

There are four elements that must be present for the business judgment rule to act as a shield to director liability: (a) the decision under review must be a business decision (i.e. one that a director makes in his managerial capacity); (b) the director may not stand to benefit personally from

---

**5.** 12 U.S.C. § 1821(k) (1989).

**6.** *See* Fla.Stat. § 607.0830 (West 1993) (directors not liable for breach of duties unless breach constitutes criminal violation, self-dealing, recklessness, conscious disregard).

**7.** *FDIC v. Stahl,* 840 F.Supp. 124, 128 (S.D.Fla. 1993).

**8.** It is clear the business judgment rule applies equally to both officers and directors. *Ameri-First Bank v. Bomar,* 757 F.Supp. 1365 (S.D.Fla. 1991) ("Under the business judgment rule, *officers* and directors of a corporation are presumed to have acted properly and in good faith") (em-

phasis added) *International Insurance Co. v. Johns,* 874 F.2d 1447, 1461 (11th Cir.1989); *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 574 (11th Cir.1988); *Schein v. Caesar's World Inc.,* 491 F.2d 17, 19 (5th Cir.) cert. denied, 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974). *See also* Steinberg, *Application of the Business Judgment Rule and Related Judicial Principles—Reflections from a Corporate Accountability Perspective,* 56 Notre Dame Law 903, 904 (1981) ("The rule generally provides that corporate *officers* and directors, absent self-dealing and other personal interest, shall be shielded from liability.") (emphasis added)

the transaction; (c) the director must have exercised due care; and (d) the director must have acted in good faith. The good faith requirement is met when directors are motivated by an honest desire to benefit the corporation and not primarily by some other purpose, such as personal gain.

■ It is undisputed that these directors and officers made business decisions in approving and making the seven loans, that they did not stand to benefit personally from the transactions, and that they acted in good faith.[9] Plaintiff invoked the "due care" element in arguing to the jury that the defendants were not entitled to the shield provided by the business judgment rule. The argument was incorrect. It became abundantly clear during closing that the motion for a directed verdict should have been granted on the negligence claim at the conclusion of the evidence.

"Due care," as usually understood in cases where the gist of the action is the defendant's negligence, implies "that a party has ... been inattentive or careless, [or] that he has been guilty of [a] violation of law in relation to the subject-matter or transaction which constitutes the cause of action." Black's Law Dictionary 499 (6th Ed.1990). Memorandum R–41(b), by which the FDIC evaluated Broward Federal's lending practices, is not a law, as the examiner acknowledged. It was a constantly changing interpretation of a regulation, promulgated for internal use, which attempted to raise industry standards. During the period of the subject regulatory activities it was superseded by R41(c). For noncompliance with regulations the thrift was subject to administrative action. Similarly, failure of the thrift to abide by the Supervisory Agreement could support a breach of contract or other regulatory action—includ-

ing the removal of officers. But neither the memo or the contract established a tort standard of care.

Under the business judgment rule directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in fraud, bad faith or an abuse of discretion. *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 574 (11th Cir.1988). As already stated, the acts of the directors and managers were not inattentive or careless, but were informed affirmative decisions of a management team based on what it deemed in the corporation's best interest. All of the elements necessary in order for directors and managers to enjoy the shield from liability provided by the business judgment were present. In the absence of proof of fraud, bad faith, or an abuse of discretion, the defendants were entitled to a directed verdict as a matter of law. Nothing is changed by the fact that errors or mistakes in judgment may have resulted in a loss. Reasonable and fair-minded persons in the exercise of impartial judgment could not reach a different conclusion.[10]

## BREACH OF FIDUCIARY DUTY

After several revisions the parties agreed to the following instruction on breach of fiduciary duty:

### JURY INSTRUCTION NO. 9

### FIDUCIARY DUTY

A fiduciary obligation exists whenever one person—the client—places special trust and confidence in another person and relies upon the person—the fiduciary—to exercise his discretion or expertise in acting for the client; and the fiduciary know-

9. The same cannot be said as to a principal defendant who settled before trial.

Ira Hatch, a director who handled the bank's real estate closings, deviated from board policy and the conditions set by the board in closing a $6 million loan. According to Stahl, the loan package as approved by the Board required the borrower, J.E. Houston, to pledge an interest in his business as collateral and to further secure the loan with a $1.6 million deposit. In order to close the loan on Houston's terms, Mr. Hatch, without board approval, eliminated the condi-

tions for a pledge and guarantee, leaving the loan undercollaterized. Subsequently Hatch joined Mr. Houston in a business relationship. Hatch was paid by Broward Federal based on the amount of each loan closed. Financial statements reflect that in one year he was paid over $500,000.

Former director Ron Bergeron, who also settled before trial, never attended board meetings.

10. *See Miles v. Tennessee River Pulp and Paper Co.,* 862 F.2d 1525 (11th Cir.1989).

ingly accepts that trust and confidence and thereafter undertakes to act in behalf of the client by exercising his, the fiduciary's own discretion and expertise.

The client is entitled to the best efforts of the fiduciary on his behalf and the fiduciary must exercise all of the skill, care and diligence at his disposal when acting on behalf of the client. A person acting in a fiduciary capacity is required to make the client whole for such loss or damages as proximately resulted from the Defendant's breach of duty.

■ For the same reason that the defendants are shielded from liability under the business judgment rule, they must also be found not to have breached a fiduciary duty. Fiduciary duty, the highest standard of duty implied by law, is the duty to act for someone else's benefit, while subordinating one's personal interest to that of the other person. *See Chrysler Credit Corp. v. Whitney Nat. Bank*, 824 F.Supp. 605, 607 (E.D.La.1993); Black's Law Dictionary 625 (6th Ed.1990). The FDIC having conceded, or not disputed by evidence, that these defendants sought no personal benefits from the seven loan transactions and that they acted in good faith, there can be no finding of a breach of fiduciary duty. One may be negligent without breaching a fiduciary duty. But one who has successfully invoked the business judgment rule cannot be found to have breached a fiduciary duty based on the same business decision.

■ Federal thrift regulations give examiners and the regulatory board strong oversight and enforcement powers to prevent operational practices by savings and loan institutions which increase the risk of loss. Where the regulatory board chooses, instead, to sue individual directors and officers for management decisions which result in losses, its legal burden is the same as that of private corporations, or its receivers or trustees, in an action against officers and directors.

## MOTION FOR MISTRIAL

### 1. Closing Argument

Several actions of counsel for the FDIC had the effect of impairing the jury's dispas-sionate consideration of the case, and caused unfair prejudice to the defendants. The most egregious of the incidents occurred during closing argument.

Counsel for the FDIC argued to the jury:

MR. RODRIGUEZ [For Plaintiff]: What you have here is that the directors were negligent and breached their fiduciary obligation to the bank.... *Send the right message* to the directors around the country, they got to be accountable. They got to be accountable for their actions. If they're not held accountable for their conduct, we're never going to get out of this mess, this banking mess that the country has found itself in.

MR. ALLEN [For Defendants]: Objection.

COURT: Sustained.

Ignoring the court's stern ruling, counsel continued in the same vein:

MR. RODRIGUEZ: The only way that we can assure that our depository institutions are going to be responsibly run, is if we insist that the directors conduct themselves reasonably and discharge their duties diligently, to do otherwise will invite disaster, not only for the banking system, *but for the insurance fund and ultimately the taxpayer.*

MR. ALLEN: Objection.

COURT: Sustained.

Two separate grounds for reversal are presented in the two paragraphs of arguments quoted above.

■ In *Vineyard v. County of Murray*, 990 F.2d 1207 (11th Cir.1993), the court found a similar "send a message" argument to be inappropriate. The trial court had denied the motion for mistrial. The appellate court's analysis focused on whether in light of "the entire argument, the context of the remarks, the objection raised, and the curative instruction" the remarks were such to impair the calm and dispassionate consideration of the case by the jury. In affirming the denial of the mistrial, the court was satisfied that the curative instruction sufficiently erased any prejudice that might otherwise have resulted from the argument.

Here, no curative instruction was given, and this court is certain that a curative instruction would have been ineffective.

In *Neal v. Toyota Motor Corp.*, 823 F.Supp. 939 (N.D.Ga.1993), the district court found a "send a message" argument improper and unprofessional but refused to grant a motion for a new trial finding the defendant's failure to object a tactical decision. In this case, the defendants strenuously objected.

■ The case law of this circuit takes a stronger view of the argument which asks jurors to identify with the group of persons who might be adversely affected by a decision, or implies that the jurors have a financial stake in the outcome of the trial. *Allstate Ins. Co. v. James*, 845 F.2d 315 (11th Cir.1988), commenced as an action by the insurer under a homeowner's policy, against the insureds, for a judgment that the policy be declared void for the reason that the insured's had caused or procured the fire. The insured denied Allstate's allegations and counterclaimed for breach of contract and bad faith.

In closing argument Allstate argued:

"Ladies and gentleman of the jury, if you were outside the confines of this formal setting of this courtroom, if you were reading the paper and you read the facts of this case, this is the type of case, ladies and gentlemen of the jury, you would look at and you would read the facts and say: Why didn't somebody do something about this? That's why my insurance premiums are so high. Well, that somebody is you six people. And, ladies and gentlemen of the jury we're grown up enough to know. . . ."

Counsel for the appellants objected to the argument as improper and asked that the court give a curative instruction. The judge overruled the objection and denied the request.

In reversing the order denying the motion for a new trial the court noted that "[a]n appeal to an individual's personal finances is a powerful argument that needs no added persuasion." In language that applies equally here—with the addition of taxpayers as affected persons—the court wrote:

Despite Allstate's assertion to the contrary, the remarks were highly inflammatory and tailored to appeal to the listener's self interest. Insurance premiums often require a substantial monetary commitment which few people would not reduce if able. In addition, current media and legislative attention ... have heightened the potential for prejudice. Counsel explicitly suggested to the jury that they were the "somebody [who might] do something about this." ... Such a statement, by implying a basis for the verdict other than the evidence presented could cause the jury to lose sight of the essential issue and "impair its calm and dispassionate consideration of the case."

*Id.* at 319.

Similarly, the closing argument in this case was inflammatory. It is difficult to imagine, in this country's current climate of fear regarding the soundness of the banking industry, how the jury could have remained focused on the essential issue. The narrow issue for the jury, after applying the business judgment rule, was whether the defendants abused their discretion or acted with corrupt motives or bad faith in making seven specific commercial loans.

## 2. Incompetent Evidence

■ By a pretrial stipulation, the parties agreed that all depositions could be admitted at trial. At a deposition session where an attorney for one of the settling defendants appeared, a document was produced and attached as an exhibit to the deposition. At trial, the defendants claim to have never seen the deposition before it was offered into evidence. The attached document was used by the FDIC effectively in impeaching the defendant Cheplak on cross-examination and was featured in the FDIC's closing. It had been admitted into evidence on the basis of the blanket pretrial stipulation.

During the course of its deliberations, the jury asked to see the document, at which time it was subjected to closer examination by the court. The exhibit proved to be a thoroughly incompetent document which

should not have been admitted as part of the deposition.

Initially, the document was shown to the deponent, plaintiff's witness, who, admittedly, had never seen the document and had no recollection of its content. The document is, purportedly, a transcript of a telephone conversation which begins somewhere in the middle, with Cheplak and two other persons, one of whom is identified only by initials. The principal speaker, a Drexel Burnham agent who is not identified at all, questions the underwriting practices of Broward Federal regarding some fourteen commercial loans. Only four of those loans are involved in this litigation. No name is given of the transcriber nor are the contents of the transcriptions authenticated as true and correct. Further, there was no showing that recordation of the electronic communication was authorized.

Moreover, Mr. Cheplak testified on cross-examination that he had never seen the document before and, in fact, had no memory of the subject telephone conversation. Even worse, *the unidentified principal speaker admitted in the transcript that he had never seen the loan files which were the subject of his opinion and that his source was hearsay.* For all of these reasons, the jury's request to examine the transcript of the recorded conversation was denied. That far into deliberations it is doubtful that the Court's instruction to the jury to disregard the document was effective. The verdict was returned only a few minutes after the jury was instructed to disregard that evidence.

### CONCLUSION

After reconsideration of all of the evidence, it is **ADJUDGED** that, applying a proper legal standard, the facts and inferences point overwhelmingly in favor of the defendants. The heavy-handed civil prosecution of these defendants, to "send the right message to directors around the country," was not justified by the evidence. Therefore, the motion of the defendants Angelique Stahl and Ralph Cheplak, for a directed verdict, is **GRANTED.** Alternatively, the defendants Stahl and Cheplak are entitled to a new trial. Stahl's

Motion to Dismiss based upon misconduct by the FDIC is **DENIED.**